The SNOQUALMIE TRIBE OF INDI-
ANS, on its own Behalf, and on rela-
tion of the SKYKOMISH TRIBE OF
INDIANS

v.

The UNITED STATES.

No. 7-65.

United States Court of Claims.

Feb. 17, 1967.

952

Herbert E. Marks, Washington, D. C.,
for appellant, Donald C. Gormley, Washington, D. C., attorney of record. Wilkinson, Cragun & Barker, Washington, D. C., of counsel.

Walter J. Muir, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for appellee.

Before COWEN, Chief Judge, JONES, Senior Judge, and LARAMORE, DAVIS, and COLLINS, Judges.

## OPINION

LARAMORE, Judge.

In January 1951, the appellant Snoqualmie Tribe of Indians filed a timely petition with the Indian Claims Commission alleging that it was a party to the Treaty of Point Elliott in 1855 and that under that Treaty it ceded to the United States for an unconscionable consideration a designated part of the total area described in the Treaty. Treaty with the Dwamish &c. Indians, January 22, 1855, ratified March 8, 1859, 12 Stat. 927. Jurisdiction was predicated on and recovery sought under section 2 of the Indian Claims Commission Act of 1946. 60 Stat. 1049, 25 U.S.C. § 70a (1964 Ed.). In interlocutory orders in 1960 and 1965, the Commission ruled against appellant on certain aspects of its claims. A review of the events behind the claims and the proceedings before the Commission will show the present posture of the case.

In the Treaty of Point Elliott, some 22 tribes and bands of Indians located in the Puget Sound area of the then Territory of Washington agreed with Isaac I. Stevens, the Governor and Superintendent of Indian Affairs for the Territory, to cede to the United States an area whose boundary started at a point near present-day Seattle, Washington and proceeded in a southeasterly direction to the summit of the Cascades, then north along the summit of the range to the 49th parallel (the Canadian border), then west to the Strait of Georgia, and finally south and east back to Seattle. Article I, 12 Stat. 927–928. In consideration of the cession, the Indians were given reservations, certain rights off the reservations such as the right to fish in common with white citizens of the Territory, the right to a school, and $150,000 cash to be paid to the Superintendent of Indian Affairs in a series of annual payments for the "use and benefit of the said Indians under the direction of the President of the United States." Articles II, III, V, VI, XIII, XIV, 12 Stat. 927, 928–930. The total consideration worked out to a value of about $320,000. No attempt was made to attribute ownership of any particular land to any of the participating tribes or bands, nor was any allocation of the consideration made.[1]

Much of the Snoqualmie Tribe's efforts in the pre-trial period centered on developing sufficient evidence to prove aboriginal title to the portion of the Point Elliott Treaty cession claimed in its petition. As the evidence-gathering process continued, it was concluded that the original petition should have included a claim on behalf of the Skykomish Tribe, as it appeared that the Skykomish either were a sub-group of the Snoqualmie Tribe at the time of the cession or had merged with it thereafter through intermarriage. The Snoqualmie attorneys informed the defendant's representatives of this contention, and in the 1958 hearings on the issue of the aboriginal title, the government defended against the Skykomish claim as well as the Snoqualmie. It should be noted that defendant has at all times objected to introduction of evidence on the Skykomish claim.

The Commission granted the Snoqualmie Tribe's motion to amend the petition to conform with the evidence, and the appellant, at that point being the Snoqualmie Tribe and the "Snoqualmie Tribe on relation of the Skykomish Tribe of Indians," filed proposed findings of fact setting out the following areas of exclusive use and occupancy: for the Snoqualmie Tribe, the drainage area of the Snoqualmie River, or an area of 436,-774 acres; for the Snoqualmie Tribe on relation of the Skykomish Tribe, the drainage area of the Skykomish River, or an area of 538,048 acres. The areas abut each other, the Skykomish lying to the north, and both are within the boundaries of the Point Elliott Treaty cession. There are no conflicting claims. In June 1960, the Commission issued findings of fact which concluded that appellant had aboriginal title to areas which were considerably smaller than those claimed. 9 Ind.Cl.Comm. 25, 38–39 (1960). In the accompanying opinion, it decided that the Snoqualmie Tribe could properly sue for the Skykomish, and that the claim in the amended petition was timely because the defendant was put on notice of the subject matter of the claim by the original petition which referred to the Point Elliott Treaty and all its signatories. 9 Ind.Cl.Comm. 25, 43. This was in vain, however, because of the next step in the analysis which was that the United States could not be liable owing to the lack of proof of existing Skykomish descendants. An interlocutory order containing the above was issued on June 30, 1960.

Three months later, on September 30, 1960, appellant asked the Commission by

1. In related proceedings involving appellant and other tribes with claims arising out of the Point Elliott Treaty, the Commission allocated $30,945.88 of the total 1859 consideration to the Snoqualmie Tribe and $36,255.83 to the Skykomish Tribe. 13 Ind.Cl.Comm. 583 (1964). This allocation was made on the basis of the comparative populations of the tribes at the time of the cession.

motion to modify its findings regarding Skykomish descendants, or alternatively, to reopen the record to hear new evidence on the existence of living descendants. The government responded with a motion for rehearing filed on November 3, 1960. On June 6, 1961, the Commission granted appellant's motion to reopen the record and denied the other motions. Appellant then introduced some affidavits of persons claiming Skykomish ancestry, and the government introduced some affidavits for purposes of rebuttal. On October 5, 1962, appellant renewed its motion for the Commission to modify its findings on descendants, now in the light of the new evidence. Nothing was heard from the Commission for two and one-half years, so on March 24, 1965, appellant moved for a "summary disposition" of the liability issue in its favor. This time, the Commission was more responsive. By orders of May 7, 1965, it denied this motion and the October 1962 motion to modify. In an opinion accompanying the denial of the motion to modify, it explained that it had decided its 1960 opinion regarding the Skykomish claim was incorrect, not in result but in reasoning. The Commission now wrote that it had correctly determined originally that the Snoqualmie and Skykomish Tribes were separate at the time of the Treaty, but incorrectly concluded that the Snoqualmie Tribe could amend its petition to present a claim for the Skykomish Tribe. 15 Ind.Cl.Comm. 267, 268–279 (1965). The rationale of this portion of the opinion is that the Snoqualmie and Skykomish are not in "privity" so that the former can represent the latter, and that even if they were, the Skykomish claim is an original lawsuit barred by the statute of limitations. 25 U.S.C. § 70k (1964 Ed.). In this connection, the Commission explained that the doctrine of relation back enunciated in rule 13(c) of its Rules of Procedure is a procedural device of no avail to appellant here because the Commission's statute of limitations is jurisdictional—i. e., the appellant should not be allowed to circumvent the substantive consequences of an absolute time bar by a procedural device.

Consistent with the opinion denying the motion to modify, the Commission on the same day, on its own motion, withdrew its 1960 opinion, findings, and order, and substituted a new opinion, findings, and interlocutory order. 15 Ind.Cl. Comm. 267–372. Again it found that the Skykomish Tribe was separate from the Snoqualmie in 1859 and that appellant had not been able to prove the Snoqualmie were the successors. This led to the holding that the Snoqualmie could not represent the Skykomish. With regard to the boundaries, the Commission reaffirmed its 1960 finding on the Snoqualmie boundary and found it unnecessary to include any finding on the Skykomish boundary. The present appeal is primarily directed to this interlocutory order and its supporting findings and opinion. Also on appeal, though perhaps indirectly, is that portion of the June 30, 1960 interlocutory order which relates to the Skykomish boundaries.

The issues before us fall under five headings: (1) Whether the Commission was in error in changing its 1960 interlocutory order, findings of fact, and opinion *sua sponte* in 1965. (2) Whether the Snoqualmie Tribe can maintain an action on behalf of descendants of the Skykomish Tribe. (3) Whether there are Skykomish descendants among the present-day Snoqualmie Tribe members. (4) Whether the claim added by amendment relates back to the original petition to be timely. (5) Whether the Commission's findings on the boundary of the territory ceded by the Snoqualmie Tribe are supported by substantial evidence. Related to this issue is the problem of. determining the boundary of the Skykomish Tribe cession in light of the fact that the Commission's 1960 findings on this were withdrawn in 1965 leaving a void. We are not at this time confronted with any issues of valuation or offsets.

### (1)

In a recent appeal, we upheld the right of the Indian Claims Commission to *sua sponte* vacate an order and replace it with a new one where the case was kept within

the jurisdiction of the Commission by a party's motion for rehearing. Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, App. No. 2–64 (decided October 14, 1966). We balanced the interests of finality against the need for the Commission to reach the right result, and concluded that the moving party had in effect waived its interest in finality by asking the tribunal to rehear its case—i. e., it did not want the decision to be final. There remained, then, only the interest in the Commission's being correct; this being so, it was no abuse of discretion for the Commission to revise its earlier decision on its own initiative.

In the present case, the Commission did not retain jurisdiction through a motion for rehearing. It denied both the appellant's motion for modification and the government's motion for rehearing within one year of the June 1960 interlocutory order. The case stayed before the Commission on appellant's motion to reopen the record for the purpose of proving the existence of Skykomish descendants, until October 5, 1962, at which time appellant renewed its earlier motion to modify the findings on descendants. The renewed motion was denied on May 7, 1965, simultaneously with the announcement of the *sua sponte* revision of the earlier decision.

We suppose it could be argued that jurisdiction retained by virtue of a motion to modify a particular finding of fact should be a narrower jurisdiction than that retained by virtue of a general motion for rehearing. It might make sense to say that there was a valid interest in preserving the finality of the Commission's 1960 holding on all but the one factual question preserved by the motion to reopen the record. The argument would be that having decided in 1960 that the Snoqualmie could recover on behalf of the Skykomish, if there were Skykomish descendants, all the Commission had to do was determine there were Skykomish descendants and judgment would be automatic. An analogy might be the proceedings after a determination of liability to determine solely the amount of recovery—e. g., our proceedings under rule 47(c) in which liability is "final" and not in issue.

In the *Warm Springs* decision, however, we made no such limited holding. We held that the Commission has a second chance to decide an issue correctly as long as its order is not final for purposes of judicial review. It is clear the government here could not have appealed the Commission's 1960 interlocutory order, findings, and opinion to us before the disposition of appellant's outstanding motion to reopen the evidence and its renewed motion to modify. Until such time, the original findings, although uncontested before the Commission, except on the descendants' issue (the government's motion for rehearing contesting the findings had been denied), were not "final" in the sense that they were not yet ripe for review. As we said in the *Warm Springs* case: "In considering the Commission's method of reconsideration, our function is not to select the method we would use, but to determine if there has been an abuse of discretion or a clear failure to exercise discretion." Supra, slip op. p. 5. We might prefer that the Commission had decided this case only once and not put the parties to the time and trouble of altering tactics, but we do not find any abuse of discretion.

In summary, we hold that the Commission did not commit error in entering a new interlocutory order, findings, and opinion on May 7, 1965, and that the interlocutory order, findings, and opinion of June 30, 1960, have been vacated leaving only the later determinations before us on appeal.

### (2)

The Commission has jurisdiction over "[a]ny claim within the provisions of this chapter * * * presented * * * by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all its members; but wherever any tribal organization exists, recognized by the Secretary of the Interior as having authority to rep-

resent such tribe, band, or group, such organization shall be accorded the exclusive privilege of representing such Indians * * *." 25 U.S.C. § 70i (1964 Ed.).

■ With respect to the claim on behalf of the Skykomish, appellant has exerted most of its energies to establish that the Snoqualmie Tribe organization is the lawful representative of the Skykomish either because at the time of the Treaty the Skykomish were a Snoqualmie subgroup or because the tribes have subsequently merged. Taking the subgroup theory first, it is clear that the Commission correctly determined that the Skykomish were a separate and identifiable group in 1855 and not a subgroup of the Snoqualmie. In fact, the appellant appears to concede as much in the briefs before us, so we shall not refer to the evidence that suggests this conclusion other than to note that it stands unrebutted. The evidence on merger, by contrast, points both ways, but on balance supports the Commission's view that the Skykomish went out of existence as a tribe and did not merge with the Snoqualmie.

In appellant's favor is the fact testified to by its expert witness Dr. June M. Collins that the Snoqualmie and Skykomish were culturally similar. They both spoke the Salish language, although the Skykomish were apparently closer in dialect to the Skagit-speaking groups in the north, whereas the Snoqualmie spoke a dialect closer to the Nisqually Indians in the south. Also, the terrain occupied by the two tribes was identical, and, of course, adjacent. The evidence suggests the Puget Sound Indians did move around, so it is reasonable to infer that there was some contact. One Indian agent reported in 1858 that intermarriage between Snoqualmie and Skykomish was common. For these reasons it is easy to understand why the Skykomish (then known as "Skaiwhamish") were represented in the treaty negotiations by Pat-Kanam, who was the recognized chief of the "Snoqualmoo [present-day Snoqualmie] Snohomish, and other tribes,"

and why later they were placed on the Tulalip Reservation (one of the four established by the Treaty) under this same chief. Thereafter, the Skykomish disappeared from official records. The last mention of the existence of a Skykomish Tribe was in the 1870 annual report of the Commissioner of Indian Affairs which reported a population of 144 Skykomish at the Tulalip Reservation under Head Chief William Stechelch. The appellant infers from the foregoing that at some time after 1871 the Skykomish merged into the Snoqualmie and became members of the Snoqualmie Tribe. The theory is that like the surviving corporation in a corporate merger which can prosecute a cause of action that once arose in favor of the no-longer-existing partner, the surviving Snoqualmie Tribe should be able to prosecute the claims of its components.

The Commission made different inferences. Thus, it noted that the Skykomish and Snoqualmie tribes were culturally similar and that there was intermarriage, and that the government's policy of putting culturally compatible Indians together on one reservation led to still closer ties. It also noted an additional factor which was that the government had an allotment program which allowed Indians to take title to tracts of reservation land, and promoted the gradual assimilation of Indians into the white community. But from these facts, it inferred that the Skykomish Tribe simply disappeared. This is not to say that there are no Snoqualmie Tribe members with Skykomish blood. The Commission seemed to accept the fact, perhaps begrudgingly (in referring to "unsubstantiated Skykomish blood claims of a few individual Snoqualmie Indians"), that some present-day Snoqualmie Tribe members have Skykomish ancestors. The sum of the Commission's findings is only that the appellant has not been able to prove that the disappearance constituted a merger. In reviewing the record to test the Commission's findings for substantial evidence, we became aware of another ingredient which is perhaps implicit in the

Commission's analysis. It would seem it is just as likely that the Skykomish merged with another tribe placed on the Tulalip Reservation—for example, the Snohomish. Insofar as the evidence suggests merger, it suggests merger into multiple successors and in unknown degree. A merger theory for a representative lawsuit requires an identifiable successor which the facts do not show here.

■■ This is not the end of the matter for the Skykomish claim, however. Where there is no existing tribal organization, a claim "may be presented to the Commission by any member of an Indian tribe, band, or other identifiable group of Indians as the representative of all of its members." This language has been given the meaning that a showing that there exist some living members *or descendants of members* of an "identifiable group of Indians" will be a sufficient predicate for maintenance of a claim. Peoria Tribe of Oklahoma v. United States, 169 Ct.Cl. 1009, 1012–1013 (1965); Spokane Tribe of Indians v. United States, 163 Ct.Cl. 58, 72 (1963); Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 913–914, 161 Ct.Cl. 258, 270–271 (1963). Two points should be noted in this connection. The first is that a person may be a "member" of an Indian tribe even though the tribe no longer has an organization. In this sense tribal membership might be considered to be ethnic and hereditary, not political. The second is that claims brought by descendants must be representative. Awards are for all members of the group and not to be shared only by successful descendant-claimants. "How the award is to be paid and precisely who can participate * * * are questions for Congressional and administrative determination." Peoria Tribe of Oklahoma v. United States, supra, 169 Ct.Cl. at 1011–1012.

■■ All agree that there is no presently existing Skykomish Tribe organiza-

tion, but that there was a Skykomish Tribe at the time of cession. For reasons developed below, we conclude that there are among the present-day Snoqualmie Tribe membership persons who have Skykomish ancestors. It follows from this fact, and the cases, that these descendants may present the claim of the Skykomish Tribe as the representative of "all its members." We leave to the legislative and executive branches the task of deciding who is a Skykomish Tribe "member" entitled to participate in the judgment. We realize our theory of representation may present certain conceptual difficulties, and that it is a different tack from that adopted by the Commission members and argued by the parties. The theory recognizes that it is possible to be a "member" of two tribes —or perhaps even more, for purposes of presenting claims and participating in judgments.[2] Perhaps this is not a result dictated on the face of the statute. It is really neutral on the matter. However, it is a result consistent with the statute, and its purpose. See generally H.Rep. No. 1466, 79th Cong., 2d Sess., U.S.Code Cong.Serv., pp. 1347–1359 (1946). The Act creating the Indian Claims Commission was "primarily designed to right a continuing wrong to our Indian citizens * * *." Ibid., at 1347. Elsewhere in the legislative history, Indian "tribes" are referred to as the claimants. Throughout, "citizens" and "tribes" are used interchangeably. As we noted earlier, "tribes" in the statute is not limited to existing "organizations," permitting the inference that Indian "citizens" may represent the defunct tribe of an ancestor and also be members of an existing tribal organization—presumably by descent from another ancestor.

■■ To reconcile our theory to the facts of this case, it might be instructive to read our theory into the title of the case. The Snoqualmie Tribe of Indians

---

**2.** In a parallel case before the Commission, the Snohomish Tribe claimed the Skykomish Tribe as a subgroup. The Commission did not agree, however, and made findings to the contrary. Snohomish Tribe of Indians v. United States, 4 Ind.Cl.Comm. 549, 567–568 (1956).

is an existing organization and has the "exclusive privilege" of presenting the Snoqualmie claim and representing the present-day Snoqualmie descendants. This is the claim of "The Snoqualmie Tribe of Indians, on its own behalf." The Skykomish claim is also brought by the Snoqualmie Tribe organization, not as a tribal organization as such, but as the "corporate" representative of a few of its members. It is important to note, though, that these few members simply serve as the predicate to the power to represent *all* Skykomish Tribe members, some of whom may be members of other existing tribal organizations.[3] This is the claim of "The Snoqualmie Tribe of Indians, on relation of The Skykomish Tribe of Indians."

(3)

In its initial findings in this case, the Commission stated: "The proof * * * wholly fails to establish the present day existence of any 'identifiable tribe, band, or group' of Skykomish Indians, or any descendant or successor thereof." 9 Ind. Cl.Comm. 25, 39. After taking additional proof, the Commission refused to modify its original findings on this point, and answered appellant's argument (that the fact that some living Snoqualmie Indians claim descent from Skykomish ancestors supports the inference that the Skykomish Tribe was absorbed by the Snoqualmie Tribe) with the following:

> From these depositions * * * [and] * * * Snoqualmie Tribe membership applications it appears that among the present membership of the Snoqualmie Tribe there are twelve or so Snoqualmie Indians who claim through their progenitors various amounts or traces of Skykomish blood. However, it is also shown that on the same basis these Snoqualmie deponents and affiants have blood connections

with quite a few other northwest coast tribes, several of which exist today while others are extinct. * * * The present secretary of the Snoqualmie Tribe acknowledges that she knew of situations where members of other tribes undoubtedly could claim some degree of Skykomish blood. * * *

\* \* \* \* \* \*

As the Commission views this "new" evidence in its most favorable light, it shows simply that there are twelve or so members of the organized Snoqualmie Tribe of Indians who have always considered themselves to be *bona fide* Snoqualmie Indians even from birth; who to some degree have blood connections with Indians of other tribes including the defunct Skykomish tribe; and who, as enrolled Snoqualmie Indians enjoy the present benefits of Snoqualmie tribal membership while owing no allegiance to any other organized or unorganized group of Indians. [15 Ind.Cl.Comm. 267, 277–278.]

■ The purpose of setting out this passage is to show that the Commission focused on the merger issue and interpreted the so-called "new" evidence in that light. Had the inquiry been the bare question of whether there exist Skykomish descendants among the Snoqualmie membership today, we think the answer would have been in the affirmative; at least, we think there is substantial evidence to support this conclusion. We use the word "substantial" here in its technical sense, for after reviewing the applications for Snoqualmie Tribe membership, which contain the claims to Skykomish ancestors and are the key evidence on descent, we cannot say that the strongest imaginable case has been made out. The applications were submitted to the Bureau of Indian Affairs in the early

---

3. The Commission was satisfied that the attorneys for the Snoqualmie Tribe were authorized to prosecute its claim. The contract approved by the Secretary of the Interior is considered *prima facie* evidence. 9 Ind.Cl.Comm. 25, 29 (1960). See 25 U.S.C. § 70n, 81–84 (1964 Ed.).

Since the Snoqualmie Tribe organization is presenting the Skykomish Tribe claim and its authority to represent the latter flows from Snoqualmie Tribe members who claim Skykomish descent, the attorneys' contract covers this claim as well.

1940's pursuant to the Indian Reorganization Act of 1934, 48 Stat. 984–988. One of the questions asked for the names and tribal affiliation of grandparents. Not surprisingly, on many of the applications this question was left unanswered or the word "unknown" was entered. In three, the applicants claimed one or more Skykomish grandparents. It is, of course, true these "blood claims" are "unsubstantiated" as the Commission states; but this is no challenge to their credibility. The applications were filed before this lawsuit was in the making—in fact, before the Indian Claims Commission was in being. The applicants were seeking membership in the Snoqualmie Tribe, not the Skykomish Tribe, so it would seem that there was no "self-serving" aspect to the claim of Skykomish descent. With regard to the argument that most applicants were uncertain as to at least part of their ancestry making any claim suspect, we think it should be a sufficient answer that we cannot expect to get from Indian applicants the fully documented genealogy kept by Boston Brahmin families.

To summarize, we think there is unrebutted evidence to establish the probability that among the Snoqualmie Tribe members there are some who can rightfully claim Skykomish descent, and we do not understand the Commission to have made any finding to the contrary. In fact, the Commission's general statement that Snoqualmie Tribe members have blood ties with many northwest coast tribes supports this conclusion. This is not to say, however, that any particular evidence in this case proves Skykomish descent for purposes of a judgment, however. That determination is left to the legislative and executive branches, and is not foreclosed by our inquiry which is necessarily limited to the jurisdictional question.

(4)

We come now to the very difficult question of whether the Skykomish claim, which the Commission initially allowed to be added by amendment on October 13, 1958, can relate back to the original petition, which was filed on January 29, 1951. If it does not, it is barred by the Commission's statute of limitations which expired five years after August 13, 1946. 25 U.S.C. § 70k (1964 Ed.).

In its 1960 opinion, the Commission assumed that it did relate back and made no reference to this difficulty. In the 1965 order denying appellant's motion to modify the 1960 findings and order, the Commission took a different position. It assumed *arguendo* that the Snoqualmie Tribe could represent the Skykomish,[4] but stated that the claim of the latter "stands as an original law suit * * * filed * * * after the statutory cutoff date." 15 Ind.Cl.Comm. 267, 273. It based its view on two factors, the first being that one in a representative capacity enjoys only the rights of the person he represents, and it is clear that the Skykomish Tribe, if it still existed, could not have brought an original lawsuit in 1958. The second factor noted by the Commission was that the governing statute of limitations of the Act is "primarily jurisdictional," so that the time period cannot "be enlarged by implication, by the consent of the parties, or by the liberal use of available procedural devices." Ibid., at 274, n. 9. See United States v. Seminole Nation, 299 U.S. 417, 57 S.Ct. 283, 81 L.Ed. 316 (1937); Delaware Tribe of Indians v. United States, 84 Ct. Cl. 535 (1937). To appellant's argument that the Skykomish claim arose out of the same transaction as the one stated in the Snoqualmie petition, "namely the Point Elliott Treaty," and that the government was thereby on "sufficient notice * * * that it could be sued not only on the Snoqualmie claim, but for any claim arising out of this same treaty which the Skykomish might wish to bring * *," the Commission responded that the original petition, which claimed with particularity a certain portion of the Treaty cession, could not have put the defendant on adequate notice to "justify petitioners [sic] request to amend on the basis of

4. This assumption was made in only one part of the opinion.

'relation back.'" Ibid., at 276. This is a "doubledecker" approach. The Commission is saying its rule 13(c), which allows an amendment to relate back if it arises out of the "conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," cannot be used to circumvent a "jurisdictional" statute of limitations; it is also saying the original claim in this case did not give the defendant adequate notice that it might have to defend against other, related claims.

We disagree with both conclusions. In analyzing the application of the Commission's rule 13(c), we assume the statute of limitations is "jurisdictional." This seems to be well supported by the cases. See United States v. Seminole Nation, supra; Delaware Tribe of Indians v. United States, supra. For us, however, the inquiry does not stop there, because there may be some room in the statutory provision itself to permit application of the procedural rule. The statute bars claims existing before August 13, 1946, "but not presented within" five years thereafter. The question is whether the Skykomish claim was "presented" before August 13, 1951, and this can be resolved in appellant's favor only if the Commission's rule of relation back is consistent with a liberal reading of the word "presented."

▬▬▬ Rule 13(c) states the following:

> Whenever the claim or defense asserted in the amended pleading arose

out of the conduct, transaction, or occurrence set forth or attemped to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

It is identical to our rule 22(c) and rule 15(c) of the Federal Rules of Civil Procedure. Its purpose is, of course, intertwined with that of the statute of limitations which it permits the moving party to circumvent. A primary purpose of statutes of limitations is "to ensure that parties are given formal and seasonable notice that a claim is being asserted against them;" it may be said of the Commission's rule 13(c) that it "is based on the idea that a party who is notified of litigation concerning a given transaction or occurrence is entitled to no more protection from statutes of limitations than one who is informed of the precise legal description of the rights sought to be enforced." 3 Moore, Federal Practice ¶ 15.15[2], p. 1018 (1964 Ed.). Thus notice is the test, and it is built-into the rule's requirement that the amended pleading arise out of the same "conduct, transaction, or occurrence." [5] In other words, the inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set forth in the original pleading.

The Commission's statute of limitations' built-in notice requirement is found in the word "presented." We are of the view that rule 13(c) can only be given meaning if it is read into or along with the notice requirement in the statute of

5. The doctrine of relation back antedated the adoption of the Federal Rules, and accordingly it might be thought that rule 15(c) added nothing. 1A Barron & Holtzoff, Federal Practice and Procedure § 448 (1960 Ed.). In fact the Federal courts have applied rule 15(c) very liberally. Ibid., at p. 755. See Preliminary Draft of Proposed Amendments to Rules of Civil Procedure for the United States District Courts, 76, 78-79 (March 1964). This is consistent with the goal of modern procedure to lessen the perils of pleading. By rejecting the formalistic requirements of the old "cause of action" in favor of an approach which focuses on a claim for relief and its underlying "aggregate of operative facts," rule 15(c) assures that the rights of the parties to a transaction or occurrence can be determined without being disrupted or extinguished by a pleading technicality. Of course, there must be limits on amendments, but the notice requirement performs this job. Courts can assure adequate notice in applying the "transaction or occurrence" standard. In this connection, it should also be noted that subpart (a) of rule 15 gives courts another control in barring amendments that would be prejudicial or unjust to the adversary. See Note: Federal Rule 15(c) and the Doctrine of Substantive Conformity, 59 Col.L.Rev. 648, 656-657 (1959).

limitations.[6] A restrictive view would limit application of the rule to minor pleading mistakes. We think modern practice requires a more imaginative approach, and that "presented" should be read liberally to permit an amended pleading to relate back where there is sufficient notice.

■ In the present case, the amendment appears to introduce a new party and a new cause of action. The general rule, as defendant points out in a review of a spate of cases, is that the rule of relation back does not extend to amendments that add new parties or causes of action. See 3 Moore, Federal Practice ¶ 15.15, p. 1041, n. 6, and cases cited thereat (1964 Ed.); 1A Barron & Holtzoff, Federal Practice and Procedure § 448 (1960 Ed.). But stating the general rule is not too helpful here, for it simply states a conclusion. Each case must be tested by the "conduct, transaction, or occurrence" standard to determine whether adequate notice has been given. Applying this standard to our facts, it is apparent that the Point Elliott Treaty is the "transaction" giving rise to the claims of the tribes involved. The government would doubtless accept this, but argues that the original Snoqualmie claim, alleging unfair treatment under the Treaty, did not in fact give notice of the subsequent Skykomish claim. We think the government and the Commission have taken an unduly narrow view of the notice requirement. First, we note that on our theory of representation there is no new party added by amendment. The Snoqualmie Tribe is the only claimant; it is simply an entity serving in two representative capacities. The government can be charged with notice of this possibility through its authority as administrator of Indian Affairs. Second, although the claim

brought by the Snoqualmie organization "on relation of" the Skykomish Tribe is technically a different cause of action from that presented originally, it is sufficiently closely related to warrant the conclusion that the government received adequate notice of the possibility that it might have to defend against a broader claim.

■ This makes particularly good sense in light of the fact that if the government's conduct was unconscionable or if the dealings were other than fair and honorable, the wrong affected all Treaty participants. Only the proof on tribal boundaries would be different, and here the government has not been prejudiced in any way by appellant's tardiness in clarifying its position. We are not saying the present issue of relation back is open-and-shut. There is much in the government's argument, and we would have greater difficulty allowing the amendment if we thought it was brought by an entirely unrelated party even though it arose out of the same transaction. Thus, we have taken some care to explain the mechanics of our approach which focuses primarily on an analysis of the standing of the claimant and the question of notice. We allow the amendment here because the government was put on notice in 1951 of the possibility that the Snoqualmie organization might expand the scope of its claim.

(5)

There remains the question of the boundaries. With respect to the Snoqualmie claim, the Commission found both in 1960 and 1965 that as of the effective date of the Treaty, "to wit, March 8, 1859, the date of Senate ratification, the petitioner held Indian title to the following tract of land:

Commencing at the northeast corner of the townsite of Monroe, Washing-

6. The Indian Claims Commission Act authorizes the Commission to establish its own rules of procedure. 25 U.S.C. § 70h (1964 Ed.). This is analogous to the enabling act which authorizes the Supreme Court to prescribe rules of procedure for the Federal courts. 28 U.S.C. § 2071 (1952 Ed.). It could be argued that rules authorized by statute enjoy a "statutory status" so that the Commission's rule of relation back could qualify its statute of limitations. The perils of this approach have been noted in Sibbach v. Wilson & Co., 312 U.S. 1, 18, 61 S.Ct. 422, 89 L. Ed. 479 (1941) (dissenting opinion).

ton; thence southwesterly to the head-waters of Tuck Creek; thence south by southeasterly to the town of Kerriston, Washington; thence southeasterly to Annet Lake; thence northeasterly to Snoqualmie Pass; thence northwesterly to the mouth of the Creek on the east shore of Lake Hancock; thence northwesterly to and including all of Lake Hannan; thence northwestward to the place of beginning. [15 Ind.Cl.Comm. 267, 307.]

Appellant challenges this ultimate finding as unsupported by substantial evidence. It argues that it offered the only evidence on the size of the area, and that this evidence could only lead to a finding that the Snoqualmie Tribe had title to the entire natural drainage basin of the Snoqualmie River—an area of 436,774 acres. As identified by appellant, the key issue is whether the Snoqualmie were "fishing" or "hunting" Indians. The former type would probably stay near the river; the latter would presumably need a greater area to subsist.

We note, at appellant's urging, that the Commission in 1965 rewrote some of its earlier findings and apparently shifted its emphasis. In 1960, the Commission found: "[t]he people of this area were interested in both land and sea hunting, the * * * Snuqualmi [sic] * * * being concerned more with the former." 9 Ind.Cl.Comm. 25, 34. In 1965, it omitted this language, and in the parallel finding considered the Snoqualmie as culturally similar to other Puget Sound Indians in having "an almost universal and paramount dependence upon the products of a marine economy to sustain the tribal way of life." 15 Ind.Cl.Comm. 267, 286. Appellant argues this "change" in the findings brings into focus the faulty premise upon which the ultimate finding is based—i. e., that the Snoqualmie were "fishing" Indians. Appellant sees the 1960 findings as support for its view that the Snoqualmie were both fishing and hunting Indians.

■ The difficulty with appellant's position is that it ignores other new language in the 1965 findings. It is true

the Commission's ultimate finding is premised on a view that the Snoqualmie were *primarily* fishing Indians, but it did not disregard the facts mentioned in the 1960 opinion. Thus, it wrote in 1965 that "the Snoqualmie Indians, who had horses, were rated as one of the better hunting tribes[,]" and that "the Snoqualmie * * * wandered and roamed through the Cascade Mountains on hunting expeditions." Ibid., at 288. No doubt this represents a change from a statement that the Snoqualmie were "more concerned with land hunting than sea hunting," but it does not necessarily represent a change in the overall findings. In any case, even if the 1960 findings were not as consistent with the ultimate finding as the 1965 findings are, there is no reversible error. The Commission has not changed its mind, and the ultimate finding is supported by substantial evidence in both 1960 and 1965, though there may be minor inconsistencies in the 1960 findings.

■ In so deciding, we have looked to a number of factors. All the written reports of Indian agents submitted in the mid-nineteenth century and the testimony of the experts suggest that the Snoqualmie had a string of villages, or perhaps one continuous village, located along the Snoqualmie River. This supports the inference that the tribe was not nomadic and was able to support itself from the resources available in the immediate vicinity. The testimony abounds with references to the cultural similarity of appellant to other Puget Sound Indians. It is well-known that seafood, notably salmon and shellfish, was the primary food for the Indians located on the salt water. It is a reasonable inference that the inland Indians had similar habits and tastes to the degree possible. Appellant makes much of the fact that some Snoqualmie were located upriver where there were less salmon and that the salmon season was not continuous, but this does not mean the Indians were not *primarily* fish eaters. There is also evidence that the Snoqualmie were land hunters and had horses, and that they

moved around far enough to be in contact with other tribes, notably the Skykomish. The facts further show it is certainly possible, if not likely, that some Snoqualmie reached the perimeters described in the original petition. However, even assuming the Snoqualmie relied on hunting for a large part of their subsistence, the facts do not indicate that more land than the Commission found title to was necessary to fulfill the needs of the tribe in 1859. In this connection, it is relevant (although the Commission made no reference to this as having a bearing on the area problem) that the Snoqualmie population at the time of the cession numbered about 350. This gives some idea of the food needs of the tribe and the hunting area necessary to meet such needs. There is no evidence on how many acres might be necessary to provide some percentage of the food needs of 350 people, but it is reasonable to suppose that something less than 436,774 acres would suffice. Of course, it is beyond dispute that a tribe may have title to a greater area than it would need for subsistence, so this evidence is relevant only in showing that the tribe could subsist on the land area determined by the Commission, and that it might therefore have limited itself to that area in 1859. There is obviously no evidence expressly favoring the straight-line boundaries found by the Commission, and it is undoubtedly true, as appellant argues, that Indians thought in terms of natural boundaries and not arbitrary lines. However, any boundary determined in the present fashion is necessarily arbitrary, so straight lines are as permissible as curved lines or natural boundaries. As we said in the *Warm Springs* case, "[o]ur imprimatur [in reviewing Indian Claims Commission determinations for substantial evidence] is one of reasonableness, not rightness."

Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, App. No. 2–64 (decided October 14, 1966). The boundary determined by the Commission is a "reasonable" approximation of the extent of Snoqualmie dominion at the time of the cession.

With respect to the Skykomish claim, an additional issue is raised. In its 1965 findings of fact, the Commission made no finding on the Skykomish boundary. This followed from its decision to deny the Skykomish claim altogether and substitute new findings on the Snoqualmie claim. Accordingly, there is no specific finding on Skykomish ownership before the court. In a post-argument memorandum, appellant indicated that it would consent to a reinstatement of the Commission's 1960 finding on the Skykomish claim.[7] We do not understand the government to object. This seems to be a reasonable solution to the problem; in fact, it seems to accord with the Commission's thinking as shown by the following portion of its 1965 *per curiam* opinion denying petitioner's motion to modify the 1960 action: "upon its own motion, *and without changing the substance of its ultimate findings* and conclusions *with respect to* the Snoqualmie and *Skykomish claims,* the Commission will undertake to amend its findings of fact previously entered herein as well as certain language in the opinion and interlocutory order." (Emphasis added.) Ibid., at 280–281.

For the same reasons we find that the Snoqualmie boundary determination is supported by substantial evidence, we conclude that the Skykomish determination should be upheld. We realize that the Commission assigned to the Skykomish a smaller area than to the Snoqualmie (about 100,000 acres of the 538,048 claimed as compared with 224,000 acres

7. In 1960, the Commission found that the Skykomish Tribe exclusively used and occupied the following area at the time of the cession:
"Commencing at the northeast corner of the townsite of Monroe, Washington; thence southeasterly to Lake Hannan; thence eastward to Mount Index; thence southeastward to Cleveland Mountain; thence northeastward to the confluence of Tye and Beckler Rivers; thence northwesterly to Mount Stickney, a peak about 6 miles northeast of Goldbar, Washington; thence southwesterly to place of beginning." [9 Ind.Cl.Comm. 25, 39.]

assigned to the Snoqualmie of the 436,-774 claimed) and that there were more Skykomish than Snoqualmie in 1859 (450 as compared with 350). However, we feel that the discrepancy may be explained by the evidence suggesting the greater hunting proclivities of the Snoqualmie.

### Conclusion

In conclusion, we hold (1) that the Commission did not commit error in vacating, on its own motion, its 1960 actions and entering a new interlocutory order, findings, and opinion on May 7, 1965; (2) that the Snoqualmie Tribe organization can present the claim of the Skykomish Tribe assuming there are Skykomish descendants in the present-day Snoqualmie Tribe; (3) that there is substantial evidence to show the existence of Skykomish descendants among the present-day Snoqualmie Tribe members; (4) that the Skykomish claim relates back to the original petition so is not time-barred; and (5) that the Commission's findings on the Snoqualmie and Skykomish boundaries are supported by substantial evidence.

Affirmed in part, Reversed in part, and Remanded.