**IDAHO POWER COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 07–730C.

United States Court of Federal Claims.

June 1, 2012.

Mark J. Matthews, Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, for plaintiff. With him on the briefs were Adam T. DeVoe and David G. Scott, Brownstein Hyatt Farber Schreck, LLP, Denver, Colorado, and James C. Tucker, Idaho Power Company, Boise, Idaho.

J. Reid Prouty, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Acting Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, and Bryant G. Snee, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

This case concerns a contractual allocation of water for production of power from the upper Snake River in Idaho. In 1923, Idaho Power Company ("Idaho Power") reached an agreement with the Bureau of Reclamation ("the agency") concerning construction of the then-proposed American Falls Dam on land partially owned by Idaho Power and with respect to claimed water rights as to which Idaho Power had priority over those filed by the United States ("the government"). The agreement preserved rights to Idaho Power for production of hydroelectric power but obligated it to pay a portion of the maintenance costs of the dam. That agreement was partially modified and superseded by an agreement in 1976 providing for construction and operation of the American Falls Replacement Dam.

In 2007, Idaho Power filed a complaint in this court alleging that the government had deprived the company of its water storage rights. After significant discovery and other pretrial proceedings had occurred, the case was stayed to allow the specially constituted Idaho Snake River Basin Adjudication Court to address water rights on the segment of the Snake River that included the American Falls Replacement Dam. After that adjudication had been completed in pertinent part, the stay was lifted and Idaho Power filed a revised complaint on February 13, 2012. In that revised complaint Idaho Power sought refund of operating and maintenance costs at the dam that it had purportedly overpaid since 2001.

The government has filed a motion to dismiss part of the revised complaint pursuant to Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC"). It argues that under the statute of limitations applicable to suits under the Tucker Act, the court lacks jurisdiction to entertain any claim concerning payments made prior to 2006, *i.e.*, six years before the revised complaint was filed. Idaho Power responds that its revised complaint relates back to its initial complaint filed in 2007 such that the court could award damages for allegedly overpaid maintenance costs from 2001 onwards.

## BACKGROUND[1]

The government and Idaho Power first entered into an agreement concerning water rights at American Falls on June 15, 1923. Pl.'s Resp. to Def.'s Mot. for Partial Dismissal ("Pl.'s Opp'n") Ex. 1 ("Contract Between the United States and the Idaho Power Company, Relative to Power Rights at American Falls, Idaho") ("1923 Contract"). The United States wanted to construct a reservoir at American Falls, Idaho, to store the waters of the Snake River for use in irrigation. 1923 Contract art. 2.[2] Idaho Power owned part of the land of the dam site, had power generating stations and other property that would have to be destroyed to build the dam, and had filed claims for water rights that preceded the filings of the government. *Id.* arts. 5–6. Idaho Power also possessed two hydro-

---

1. The recitations that follow do not constitute findings of fact by the court but rather are taken from the pleadings and from an adjudicatory decision by an Idaho court that is susceptible to judicial notice. Unless otherwise noted, however, the factual circumstances appear to be undisputed.

2. The dam was to be constructed as part of the Minidoka Project to reclaim federal public lands. 1923 Contract art. 2.

electric plants downstream of the site that depended on a steady flow of water from American Falls. *Id.* art. 4.

Under the terms of the contract, Idaho Power conveyed the land, power facilities, and other property at American Falls to the United States. 1923 Contract art. 9. It reserved, however, the right to use the Snake River water flow for power generation. *See id.* art. 9(a). In exchange for the land and property, the United States gave Idaho Power $1,000,000, *id.* art. 27, and the right to store water in the reservoir, *id.* arts. 16, 18–19. Specifically, the contract granted Idaho Power a "primary right" to store up to 45,000 acre-feet of water per year in the reservoir. *Id.* art. 16. The company could demand that this stored water be released from the dam to power its hydroelectric plants. *Id.* art. 21. The contract further provided that the company would have a "secondary right" to store up to 255,000 acre-feet of water. *Id.* art. 18. This right was secondary in the sense that the company could only exercise it "when such capacity is not then required and not being used by the owners of irrigation rights to the use of such capacity." *Id.* Overall, the contract accordingly gave Idaho Power the ability to derive power from the release of up to 300,000 acre-feet of water a year, subject to some limitations. *Id.* arts. 19–21. Idaho Power agreed to pay a percentage of the operation and maintenance ("O & M") costs of the dam. *See id.* art. 17.

The United States built the American Falls dam and reservoir pursuant to the 1923 Contract. The reservoir appears to have held 1,700,000 acre-feet of water, such that Idaho Power's primary storage right of 45,000 acre-feet constituted 2.6471% of the total capacity. *See* Pl.'s Opp'n Ex. 2 ("Spaceholder Contract Among the United States, the American Falls Reservoir District, and Idaho Power Company for Storage in the American Falls Replacement Dam and for Construction and Operation and Maintenance of the American Falls Replacement Dam Program") ("1976 Contract"), art. 5. The parties complied with the terms of the agreement without event for over 50 years. At some point, however, the United States discovered that alkali-aggregate chemical reactions were af-

fecting the concrete of the dam and reducing its total storage capacity. *Id.* art. 2.

On March 31, 1976, the United States, Idaho Power, and the American Falls Reservoir District entered into a contract concerning the construction of a replacement dam at the American Falls. *See, e.g.,* 1976 Contract art. 19(a). This 1976 Contract reaffirmed the 1923 Contract between the United States and Idaho Power except insofar as the terms of the new agreement conflicted with those of the 1923 Contract. *Id.* The United States agreed to "continue to make available to [Idaho Power] stored water accruing to 2.6471 % of the active capacity of the Replacement Dam." *Id.* art. 21(b). The contract also provided that Idaho Power would pay 7.1388% of the O & M costs of the new dam. *Id.* art. 28(b). This latter percentage corresponds roughly to the same proportional amount that the company paid for O & M fees under the 1923 Contract. *See* Second Am. Compl. ¶¶ 36–37. Idaho Power paid this 7.1388% without complaint until the instant suit. The 1976 Contract does not directly address Idaho Power's secondary storage capacity.

In 2001, Idaho Power asked the Bureau of Reclamation to release water from its 255,000 acre-feet of secondary storage capacity pursuant to the 1923 Contract. Compl. ¶¶ 22, 24. It avers that the agency refused to comply. Compl. ¶¶ 22, 24. Idaho Power alleges that it made similar requests during the following six years, all of which were denied by the agency. Compl. ¶¶ 25–27.

On October 16, 2007, Idaho Power filed its initial complaint in this court, alleging a breach of contract and breach of trust by the government. Compl. ¶¶ 28–38. Plaintiff asked the court to award damages, the bulk of which would be for electricity it would have generated had the agency abided by the 1923 Contract. Compl. ¶¶ 31, 37. On September 30, 2008, Idaho Power submitted an amended complaint. This pleading was largely identical to the first complaint, except for a new claim for declaratory judgment. First Am. Compl. ¶¶ 50–51. Idaho Power asked the court to issue "a binding, prospective declaration of rights and duties stem-

ming from the 1923 Contract." First Am. Compl. ¶ 51.

After an answer to the amended complaint was filed and the parties had undertaken discovery and trial preparations, on March 17, 2010, they moved to stay the proceedings pending the outcome of a water rights case in a special Idaho state court. *See* Joint Mot. for Stay of Proceedings ("Joint Mot. to Stay"). An Idaho court had been established to settle "the nature, extent and priority of the rights of all users of surface and ground water from [the Snake River] system." Idaho Code Ann. § 42–1406A (uncodified 1994). Although the Idaho Snake River Basin Adjudication ("SRBA") Court began proceedings in 1987, it serially considered segments of the river on a subcase-by-subcase basis. *See* Hr'g Tr. 18:25 to 19:4 (May 3, 2012) ("[T]he Snake River Basin Adjudication was established, as you said, to address various segments of the river. And so there is Basin 1, Basin 2, and they go all the way up into the 40s, various segments of the [r]iver."). The Idaho SRBA Court began considering the claims on the American Falls portion of the river basin in the late 2000s. *See In re SRBA*, Case No. 39576, Subcase 01–2064 (Idaho Dist. Ct. Mar. 31, 2011) (attached as Ex. 1 to Def.'s Notice of Filing, May 5, 2011, ECF No. 44). The parties sought the stay because they believed that resolution of water rights in that case might narrow the contractual issues before this court. Joint Mot. to Stay at 2. The court granted the requested stay. *See* Order of March 23, 2010, ECF No. 24.

The Idaho Snake River Basin Adjudication Court issued its ruling over a year later, on March 31, 2011. It held that Idaho Power's only storage guaranteed in the reservoir was its primary right for 45,000 acre-feet of water. *In re SRBA* at 24. The court reasoned that "the 1976 Spaceholder Contract intended to define *all* spaceholder storage rights,

whether considered secondary storage or pass-through." *Id.* Because the 1976 Contract did not grant or reaffirm the right to 255,000 acre-feet from the 1923 Contract, "that meant Idaho Power's secondary storage right was effectively waived, abandoned, relinquished or simply bargained away." *Id.* The Idaho court declined to rule on whether the United States might subsequently be determined to hold the right to those 255,000 acre-feet in trust for Idaho Power, finding that issue "incomplete and not ripe for decision." *Id.* at 27. Idaho Power moved for reconsideration, Hr'g Tr. 3:15–17 (June 7, 2011), but without success.

On January 24, 2012, in the aftermath of the *SRBA* decision, Idaho Power submitted a supplemental complaint.[3] In this latest version of the complaint, Idaho Power omitted its allegations that the agency's failure to release waters breached the 1923 Contract. Instead, the supplemental complaint focuses on a demand for a refund of a portion of the O & M fees Idaho Power has paid since 2001. Second Am. Compl. ¶¶ 48–50. Idaho Power alleges that it agreed to pay 7.3188% of the O & M expenses based on the understanding that it still had a secondary storage right of 255,000 acre-feet, Second Am. Compl. ¶¶ 36, 43–44, noting that all the other spaceholders pay O & M fees roughly proportional to their storage capacity in the American Ralls reservoir, Second Am. Compl. ¶ 41. Idaho Power claims that, if it had known that it possessed only the primary right (comprising 2.6471 % of the reservoir), it would not have agreed to pay more than approximately 2.6471% of the O & M costs. Second Am. Compl. ¶¶ 35, 46. Consequently, it argues, the court should refund the surplus payment and rescind or reform the contract based on the doctrine of mistake. Second Am. Compl. ¶¶ 49, 55–56.

The government filed a motion for partial dismissal of this complaint on February 27, 2012, seeking to dismiss the supplemental

---

3. The court granted leave for Idaho Power to file a second amended complaint on February 13, 2012, *see* Order of Feb. 13, 2012, ECF No. 36, after the government advised that it did not oppose the filing, *see* Def.'s Resp. to Pl.'s Mot. to Amend Its Compl., Feb. 10, 2012, ECF No. 35. The government then noted that the time period covered by the new complaint would be placed in dispute by way of a motion for partial dismissal. *Id.*

Although styled a "second amended complaint," Idaho Power's pleading is more properly regarded as a supplemental complaint, as discussed *infra*, note 4, and the court has treated it as such.

complaint insofar as it claimed alleged overpayments made before January 24, 2006. Def.'s Mot. for Partial Dismissal at 1. The government argues that any payments made prior to this date fall outside the six-year statute of limitations prescribed by 28 U.S.C. § 2501 for claims made under the Tucker Act, 28 U.S.C. § 1491(a). *Id.* at 1–2. Idaho Power has opposed this motion, contending that the second amendment to its complaint relates back to the filing of its original complaint on October 17, 2007. Pl.'s Opp'n at 1 n. 2. Under this view, the court would be empowered to award damages for alleged overpayments made on and after October 17, 2001. *Id.*

## STANDARDS FOR DECISION

"Jurisdiction must be established as a threshold matter before the court may proceed with the merits of this or any other action." *OTI Am., Inc. v. United States,* 68 Fed.Cl. 108, 113 (2005) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 88–89, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). This court's subject matter jurisdiction is "prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings, Inc. v. United States,* 142 F.3d 1459, 1461 (Fed.Cir. 1998) (citing *United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). One dimension of that consent is the six-year statute of limitations specified in 28 U.S.C. § 2501. *See John R. Sand & Gravel Co. v. United States,* 457 F.3d 1345, 1354 (Fed.Cir.2006) ("[S]tatutes of limitations for causes of action against the United States, being conditions o[n] the waiver of sovereign immunity, are jurisdictional in nature." (quoting *Martinez v. United States,* 333 F.3d 1295, 1316 (Fed.Cir.2003) (en banc))), *aff'd,* 552

U.S. 130, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008).

As plaintiff, Idaho Power "bears the burden of establishing subject-matter jurisdiction by a preponderance of the evidence." *M. Maropakis Carpentry, Inc. v. United States,* 609 F.3d 1323, 1327 (Fed.Cir. 2010) (citing *Reynolds v. Army & Air Force Exch. Serv.,* 846 F.2d 746, 748 (Fed.Cir. 1988)); *see also McNutt v. General Motors Acceptance Corp. of Ind.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In determining whether subject matter jurisdiction exists, the court "accepts as true the undisputed allegations in the complaint, and draws all reasonable inferences in favor of the plaintiff." *De Maio v. United States,* 93 Fed.Cl. 205, 209 (2010) (citing *Hamlet v. United States,* 873 F.2d 1414, 1415–16 (Fed. Cir.1989)).

## ANALYSIS

The sole issue presented by the government's motion for partial dismissal is whether Idaho Power's revised complaint relates back to the original complaint.[4] The relation-back doctrine is governed by RCFC 15(c). The pertinent portion of the Rule states that "[a]n amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim ... that arose out of the conduct, transaction, or occurrence set out ... in the original pleading." RCFC 15(c)(1)–(c)(1)(b). In applying this rule, courts have focused on whether the claims in the original complaint put the defendant on notice of the claims contained in the supplemental complaint. *See Barron Bancshares, Inc. v. United States,* 366 F.3d 1360, 1369 (Fed.Cir.2004) ("[T]he inquiry in a determination of whether a claim should relate back will focus on the notice given by the general fact situation set

4. Idaho Power's "second amended complaint," "set[s] out [a] transaction, occurrence, or event that happened after the date of the pleading to be supplemented," RCFC 15(d), namely the decision of the SRBA, and consequently it should be classified as a supplemental complaint. *See Petro-Hunt, L.L.C. v. United States,* 105 Fed.Cl. 37, 44 (2012). For purposes of the government's motion however, the distinction between an amended complaint and a supplemental complaint is not material to determining whether the new

pleading relates back to the original complaint. *See, e.g., Federal Deposit Ins. Corp. v. Knostman,* 966 F.2d 1133, 1138 (7th Cir.1992) ("The distinction between an amended pleading and a supplemental pleading is often disregarded for purposes of relation back under Rule 15(c)." (citing 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1508 (2d ed.1990))); *Finnerty v. RadioShack Corp.,* 390 Fed.Appx. 520, 527 n. 2 (6th Cir.2010) (same).

forth in the original pleading." (quoting *Snoqualmie Tribe of Indians ex rel. Skykomish Tribe of Indians v. United States*, 372 F.2d 951, 960 (Ct.Cl.1967))); *see also Baldwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 149 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (per curiam) ("The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide." (citing 3 James Wm. Moore et al., *Moore's Federal Practice* ¶ 15.15[3], p. 15–194 (2d ed. 1984))).

■ If the notice test is met, it does not matter whether the new claim is premised on a legal theory different from the one set out in the original complaint. *See J.L. Simmons Co. v. United States*, 412 F.2d 1360, 1387 (Ct.Cl.1969) ("It would be a return to the old 'cause of action' approach to declare the claim time-barred because the original theory of relief was ... breach of contract, and the consequences of those defective procedures are now characterized as a 'taking.' "); *see also Federal Deposit Ins. Corp. v. Bennett*, 898 F.2d 477, 480 (5th Cir.1990). In analyzing whether the original complaint provided sufficient notice to the government, the court is "mindful that the relation back doctrine of Rule 15(c) is to be liberally applied." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1260 n. 29 (9th Cir.1982); *Snoqualmie Tribe*, 372 F.2d at 960 n. 5.

■ The court begins its inquiry by "compar[ing] the original complaint to the amended version." *Creppel v. United States*, 33 Fed.Cl. 590, 594 (1995). Here, Idaho Power's first complaint primarily alleges that the government unfairly denied Idaho Power its right to 255,000 acre-feet of secondary storage capacity, as guaranteed under the 1923 Contract. Compl. ¶¶ 22, 24. Idaho Power filed its supplemental complaint after the *SRBA* decision determined that the 1976 Contract extinguished its secondary storage right. In this pleading, Idaho Power claims that it agreed to pay O & M fees based on the mistaken belief that the 1976 Contract had perpetuated its right to the 255,000 acre-feet. Second Am. Compl. ¶¶ 38, 40–41.

Both of Idaho Power's claims manifestly turn on the viability of a right to 255,000 acre-feet of secondary storage capacity, but that fact alone does not answer the question "whether the general fact situation or the aggregate of the operative facts underlying the claim for relief in the first petition gave notice to the government of the new matter." *Vann v. United States*, 420 F.2d 968, 974 (Ct.Cl.1970) (citing *United States v. Northern Paiute Nation*, 393 F.2d 786, 790 (Ct.Cl. 1968); *Snoqualmie Tribe*, 372 F.2d at 959–61. Four separate, interrelated considerations, however, persuade the court that Idaho Power's pleadings satisfy this test.

First, the 1923 and 1976 Contracts are deeply intertwined. The government's attempt to draw a clean division between the two is simply not possible. One cannot understand the parties' legal relationship vis-à-vis the American Falls Reservoir without the aid of both documents. *See, e.g.*, 1976 Contract art. 19(a) ("The provisions of the [1923] Contract shall in all respects remain in full force and effect except that the provisions of this [1976] Contract with respect to the Replacement Dam, including but not limited to the operation and maintenance thereof and the distribution of water therefrom, shall prevail over the provisions of the [1923] Contract.").

As a result, this is not a case in which Idaho Power is attempting to draw upon a contract that is only tangentially related to the one alleged in the original pleading. *See United States ex rel. Miller v. Bill Harbert Int'l. Constr., Inc.*, 608 F.3d 871, 882 (D.C.Cir.2010) (per curiam) (declining to apply the relation back doctrine where "each contract required work to be performed on a different project and was awarded in a different year to a different winning bidder drawn from a different pool of prequalified bidders"). In effect, the 1976 Contract is more akin to a partial modification of the 1923 Contract than an independent instrument. *See* 1976 Contract art. 48 ("This [1976] Contract is supplemental and in addition to the [e]xisting [1923] Contract."); *id.* art. 19(a). Any lawsuit premised on the 1923 Contract implicates the 1976 Contract and *vice versa*. Consequently, the government had notice

that provisions of the 1976 Contract might come into play in this action, even though the original complaint focused on language in the 1923 agreement. *Cf. Snoqualmie Tribe*, 372 F.2d at 959–61 (applying relation back where amended and original pleadings both alleged violations of the same treaty, even though the original petition "claimed with particularity a certain portion of the [t]reaty cession," *id.* at 959, that differed from the portion relied upon by the amended petition).

Second, the genesis of the dispute over O & M fees is found in the 1923 agreement. It was that contract that (1) granted Idaho Power 255,000 acre-feet of secondary storage, (2) applied the general principle that a spaceholder would pay O & M fees in proportion to its storage capacity, and (3) thus fixed the company's obligations at 7.1388% of the O & M expenses. These clauses in the 1923 Contract are the preconditions to the present-day disagreement over Idaho Power's proper share of O & M costs. When the company agreed to continue paying the 1923 levels of O & M expenses in the 1976 Contract, it allegedly did so based on the belief and understanding that it retained the 1923 levels of storage capacity. Idaho Power expected that the 1923 principle of proportionality of O & M costs would persist under the 1976 Contract. Thus the current dispute stems from the same foundation that gave rise to the claim in the original complaint.

Third, the secondary storage capacity remains at the heart of both the original pleading and the supplemental complaint. The original complaint specifically informed the government that Idaho Power claimed it still possessed the 255,000 acre-feet of storage capacity granted by the 1923 Contract. Compl. ¶ 22 ("Pursuant to the 1923 Contract, [d]efendants have a contractual duty to Idaho Power to provide flows of water from the 255,000 acre-feet of secondary storage capacity."). This claim put the government on notice that it might have to defend derivative and further claims relating to the 255,000 acre-feet of storage capacity. This is particularly true where, as here, the government specifically challenged Idaho Power's right to this storage capacity in the SBRA subcase dealing with the segment of the Snake River

Basin that included American Falls. *See In re SRBA* at 2 (noting that as early as 2009, the government was arguing that Idaho Power had a right to only 44,275 acre-feet of storage capacity). The first complaint requested damages on the grounds that the government had unfairly deprived it of the secondary storage right; the later complaint alleges that plaintiff agreed to its O & M rate based on the mistaken belief that it held this storage capacity. *Cf. Tiller v. Atlantic Coast Line R.R.*, 323 U.S. 574, 580–81, 65 S.Ct. 421, 89 L.Ed. 465 (1945) (permitting the relation back of an amended complaint which added a statutory basis for recovery to the original claim of negligence, since both counts centered on defendant's responsibility for the death of the decedent).

Fourth, the government relies heavily on *Mayle v. Felix*, 545 U.S. 644, 125 S.Ct. 2562, 162 L.Ed.2d 582 (2005), to support a narrow construction of RCFC 15(c). Def.'s Mot. for Partial Dismissal at 3–5. In doing so, the government neglects the context of that case. *Mayle* was a habeas corpus case, and the Supreme Court's opinion was crafted to address relation back in that particular circumstance. *See Mayle*, 545 U.S. at 656, 125 S.Ct. 2562 ("This case turns on the meaning of Federal Rule of Civil Procedure 15(c)(2)'s relation-back provision *in the context of federal habeas proceedings*." (emphasis added)). Other courts have recognized that the Supreme Court's stringent reading of Rule 15(c) in *Mayle* turned on the habeas setting. *See United States v. Ciampi*, 419 F.3d 20, 23 (1st Cir.2005) ("[I]n the habeas corpus context, the Rule 15 'relation back' provision is to be strictly construed, in light of 'Congress' decision to expedite collateral attacks by placing stringent time restrictions on [them].'" (second alteration in original) (quoting *Mayle*, 545 U.S. at 657, 125 S.Ct. 2562)); *Quaak v. Dexia, S.A.*, 445 F.Supp.2d 130, 138 n. 4 (D.Mass.2006) ("[*Mayle*] is inapposite[,] however, as the Court made clear that its analysis was in the context of Congress's finality and federalism concerns in enacting the Antiterrorism and Effective Death Penalty Act of 1996." (quoting *Mayle*, 545 U.S. at 663, 125 S.Ct. 2562) (internal quotation marks omitted)). As a result, while this court is guided by the Supreme

148

Court's reasoning in *Mayle*, it declines to apply that holding to bar the relation-back doctrine to the supplemental complaint filed in this case.

## CONCLUSION

For the reasons stated, the government's motion to dismiss the complaint in part is DENIED. The government shall file its answer to Idaho Power's Second Amended Complaint on or before June 22, 2012.

It is so ORDERED.