**The UNITED STATES**

v.

**The NORTHERN PAIUTE NATION et al.**

**Appeal No. 3–66.**

United States Court of Claims.

April 19, 1968.

Bernard M. Newburg, U. S. Dept. of Justice, Washington, D. C., with whom was Asst. Atty. Gen. Clyde O. Martz, for appellant.

I. S. Weissbrodt, Washington, D. C., attorney of record, for appellees, Abe W. Weissbrodt and Ruth W. Duhl, Washington, D. C., of counsel.

Robert W. Barker, Washington, D. C., filed a brief, amicus curiae for The Goshute Tribe and Western Shoshone Identifiable Group of Indians, Wilkinson, Cragun & Barker and John S. White, Washington, D. C., of counsel.

Nicholas E. Allen, Washington, D. C., for the Washoe Tribe of the States of Nevada and California, joined in the amicus curiae brief of the Goshute Tribe, George F. Wright, Elko, Nev., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

NICHOLS, Judge.

This case comes to us on cross-appeals from a final judgment of the Indian Claims Commission (hereinafter called the Commission.) The matters in dispute concern (1) the timeliness of one of the claims, (2) the right of the Northern Paiute Nation or of any of the tribal or individual appellees to sue on behalf of the Mono group of Northern Paiutes, (3) whether Indian title includes rights to subsurface minerals in lands formerly under Spanish and Mexican sovereignty, (4) the inclusion of mineral enhancement in the valuation of Indian title land, (5) the inclusion of improvements made in or on land before the taking date in the valuation of that land, and (6) the ultimate conclusion of the Commission on the value of the Nevada Paviotso tract. (Hereinafter appellant and cross-appellee will be called Government and the appellees and cross-appellants (petitioners before the Indian Claims Commission) will be called Indians, unless otherwise noted.)

The Indians have asserted Indian title to some 50,000,000 acres of land in Nevada, Oregon, California and Idaho. They allege these lands were taken from them by the United States without their being compensated. The Commission found that although the Northern Paiutes did not exist as a single land-owning entity in aboriginal times, the Snakes, Monos and Paviotsos did exist as three separate aboriginal groups, each holding title to separate tracts or areas, and that the United States had taken their lands from them without compensation. Dates of taking were also found by the Commission. Prior to the valuation hearing, a net settlement of $3,650,000 was reached by the parties for the "Snake tract," of Oregon, which is no longer in litigation. After the valuation hearing the Commission found in favor of the Indians: as to the "Mono tract" in the net amount of $935,000 and as to the "Paviotso tract" in the net amount of $15,790,000. The Mono tract consists of 2,506,000 acres in California and 612,000 in Nevada. The Paviotso tract consists of 10,899,726 acres in Nevada and 716,000 acres in California. The largest and most valuable part of the famous Comstock Lode, though not all, was located in the Paviotso tract, and that accounts for most of the award for that tract, as will appear.

August 13, 1951, was the last day for filing claims under Section 12 of the Indian Claims Commission Act (60 Stat. 1049). The original petition in this case was filed on December 26, 1950, and it was on behalf of the Northern Paiute Nation and its various bands. It was filed by six named present-day organized tribes and by Walter Voorhees as a member of and representative of the Northern Paiute Nation and all its members. On August 8, 1951, a timely amended petition was filed in which 17 more individual Indians joined as petitioners. Again there were designated as petitioners "The Northern Paiute Nation and the Bands Thereof * * *." Set forth were a number of causes of action, including claims for the value of certain lands located in Nevada, Idaho, Oregon and California. The petitions alleged the Northern Paiute Nation and its constituent bands had aboriginal title to the lands in issue and that the lands had been taken from them by the United States without payment of any compensation. The amended petition also alleged that the individual petitioners and the Northern Paiute Indians, enrolled as members of the six petitioning reservation organizations, comprised a substantial part of the descendants and members of the Northern Paiute Nation and its various bands, who had held Indian title to the lands in issue. Of the individual Indian petitioners, 17 are clearly Northern Paiutes and 15 are clearly members of one of the six named tribal petitioners. Each of the tribal petitioners sued in its own right, and jointly with the others, both as successors to the claims of the Northern Paiute Nation and to the claims of each and all of its bands and in a representative capacity on behalf of said Nation and the bands thereof; and the named individual Indians sued as members and representatives of all the members of such Nation and the bands thereof.

The claimed territory, as described in the timely amended petition, extended at its southernmost point to the present town of Bishop, California. A hearing was held before the Commission on questions relating solely to the aboriginal title claims. Because of evidence adduced at that hearing showing the claimed lands to extend south from Bishop to a point below Owens Lake in California, the Commission allowed the filing of a newly amended petition (filed April 15, 1957) which, to conform to this evidence, enlarged the Indians' claim to include the area south of Bishop.

The petition of August 8, 1951, had also alleged that the Northern Paiute Nation was divided into 21 aboriginal bands, and these bands were named. Because of evidence received at the title hearing indicating that the list of 21 bands was incomplete, the Commission accepted the amended petition of April 15, 1957, with the bare allegation that the Northern Paiute Nation "was divided into various bands." The bands were not named nor was their number stated.

The Government first argued that the claim for the Mono tract, or at least that part of it which was south of Bishop, was first made in 1957, was therefore untimely and could not be made the basis for any recovery in this action. The Commission was of the opinion that:

> * * * petitioners [the Indians] have, by that amended petition [of April 15, 1957], done no more than sever the claims not presently at issue [those other than the aboriginal title claims] and better define the territory allegedly used and occupied in aboriginal times by the Northern Paiute Nation so as to conform with the evidence produced at the hearing. Petitioners did not thereby plead any new causes of action. [7 Ind.Cl.Comm. 322, 389]

The Government did admit, however, that though the 1951 petition did not specifically claim an area south of Bishop, nor did it name a band that allegedly occupied the additional land (the Mono tract), its position would be untenable if "the subsequent extension of the claim into these new areas is not a new cause of action." The Government would also

agree with the Commission's conclusion had the Northern Paiute Nation been the land holding entity. But, it said, because the Commission found the land holding entity to be the Monos or bands constituting the Monos, a group that had not, the Government alleged, instituted any action prior to the expiration of the limitations period, "the argument that the later petition can 'relate back' is no longer tenable."

We have recently dealt with the issue of when a claim can be added by amendment and "relate back" to the original timely petition. See Snoqualmie Tribe of Indians, etc. v. United States, 372 F.2d 951, 959–961, 178 Ct.Cl. 570, 585–589 (1967). The question to be asked is whether the claim for the entire Mono tract was "presented" before the statute of limitations ran out on August 13, 1951. Id., 372 F.2d at 960, 178 Ct.Cl. at 586. Sufficient notice to the Government is the test, Id., 372 F.2d at 960 and 961, 178 Ct.Cl. at 587 and 588, with our inquiry focusing "on the notice given by the general fact situation set forth in the original * pleading." Id., 372 F.2d at 960, 178 Ct.Cl. at 587 (the "aggregate of operative facts" underlying the claim for relief, Id., at footnote 5) and "the standing of the claimant * *." Id., 372 F.2d at 961, 178 Ct.Cl. at 589.

> * * * the rule of relation back does not extend to amendments that add new parties or causes of action. * * But [this] simply states a conclusion. Each case must be tested by the "conduct, transaction, or occurrence" standard to determine whether adequate notice has been given. Id., 372 F.2d at 961, 178 Ct.Cl. at 588.

Closely intertwined with this issue, and bearing on its "standing of the claimant" aspect, is the Government's next claim that neither the Northern Paiute Nation or any of the tribal or individual petitioners is entitled to represent or file claims on behalf of the Mono group. The Government has chosen to treat this as a separate issue and we will do the same. We now state why sufficient notice had been given to the Government.

The original petition did not name the Mono band among those specifically enumerated, nor did the timely amended petition. The original was headed, however:

> The Northern Paiute Nation, ex rel. Walter Voorhees; [named tribes]; each in its own right and each on behalf of the various bands and groups of each of them, and each on behalf of the Northern Paiute Nation *and the various bands and groups making up the Northern Paiute Nation,*

while the time amended petition was headed:

> The Northern Paiute Nation *and the bands thereof,* ex rel. [named individuals and tribes],

and sought relief for "the claims of the Northern Paiute Nation and claims of each *and all* the bands of the Northern Paiute Nation." (Emphasis supplied). The Monos were clearly a Northern Paiute "band." Therefore, the timely petition did include the Monos as a party to the suit.

The "conduct, transaction, or occurrence" alleged, though at different dates and in different places, was the uncompensated taking of Northern Paiute Nation land in the areas named. This included the Mono tract. The Government cannot now say that these petitions could not have led it to believe it would have to defend against Mono claims. Indeed, the Government believed the opposite, for the writings of its own expert witness, introduced by the Government and relied on by it at the hearing on aboriginal title, showed the Monos of the area claimed to be Northern Paiutes. In addition, in its Proposed Findings of Fact No. 11 before the Commis-

---

* In the *Snoqualmie* case no timely amended petition had been filed, as is not true in the case at bar. By the "original pleading" to be looked to, we do not mean only the first petition filed, but mean to include within the quoted phrase all timely petitions, original or amended.

sion, the Government identified the Indians embraced within the term Northern Paiute as "those portions of the *Mono*-Paviotso speaking peoples living east of the Sierra Nevadas * * *. This includes (1) the Indians of Owens Valley, (2) the eastern Monos, (3) some Indians in (a) the Honey Lake area and other portions of Northern California, (b) perhaps the southwest portion of Idaho, and (c) the southeast part of Oregon." Thus, this case is stronger for the Indians than was *Snoqualmie,* for there the Government had at all times objected to the introduction of evidence on the claim of the "unnamed" party. That the Government was on notice as to the Monos also answers the question of whether the area south of Bishop was timely claimed. The Commission has held in other cases that the extension of claimed boundaries does not set forth a new cause of action which would be barred by the statute of limitations. Pueblo de Zia v. United States, 11 Ind.Cl.Comm. 131, 161–62 (1962), rev'd on other grounds, 165 Ct.Cl. 501 (1964); Suquamish Tribe v. United States, 5 Ind.Cl.Comm. 140, 160–62 (1957). The Government, though agreeing with this rule, would have us limit it to only those cases where the entity for which the extended land was claimed was identical with that bringing the action. Without commenting on the validity of this limitation and assuming *arguendo* that the Government is right, the result in this case would be no different, for we have held that "the entity bringing the action" included the Mono band. It is with this latter conclusion that the Government will differ.

██ The Government next argued that none of the Indians—the Northern Paiute Nation, the named tribes or the named individuals—were entitled under the Indian Claims Commission Act to represent or file claims on behalf of the Mono group. On this point the Commission said:

> * * * the Northern Paiute Indians are a clearly defined group of American Indians within the meaning of the term "identifiable group" as used in sections 2 and 10 of the Act and, accordingly, this Commission has jurisdiction to hear and determine the claims brought by members of such groups on behalf of all its members. [7 Ind.Cl.Comm. 322, 388]

* * * * * *

The Commission considers it immaterial, for jurisdictional purposes only, that the Northern Paiute Nation may not have been an aboriginal land using entity but may rather have been composed of numerous, separate bands or groups. The fact that it was, at the time the claim was filed, a group of American Indians capable of clear and unmistakable identification brings the "Northern Paiute Nation" within the term "identifiable group" as used in the Act. (Indians of California v. United States, 122 C.Cls. 348). [7 Ind.Cl.Comm. 322, 389]

The Commission then found that the Northern Paiute Nation was not the aboriginal land holding entity. However, since the suit had also been brought for and on behalf of all the land using groups of Northern Paiute Indians, the Commission then asked whether any of those groups were aboriginal land holding groups. It found that:

> * * * those Northern Paiutes who were in aboriginal times generally referred to as Monos or Paiute of Owens Valley * * * had exclusively used and occupied in Indian fashion from time immemorial that portion of the claimed territory [put in issue by the Government in this part of the case—the Mono tract]. * * * [7 Ind.Cl. Comm. 322, 414]

And, the Mono descendants constitute part of the present-day Northern Paiute Nation, the "*identifiable group.*" As to the Mono group, the Commission then found that though there was not included in the record testimony of any Northern Paiute who could definitely trace his ancestry to a member of the Mono or Paiutes of Owens Valley group, other evidence of record and documents not included in the record did establish the

existence on the date the petition was filed of descendants of the Monos or Paiutes of Owens Valley. We think the procedure and result adopted by the Commission was correct, as was its reliance on our case of Thompson (Indians of California) v. United States, 122 Ct. Cl. 348, cert. denied 344 U.S. 856, 73 S.Ct. 91, 97 L.Ed. 665 (1952).

In *Thompson* a claim had been filed by individuals "as members of, and as representatives of, and on relation of the Indians of California, Petitioners." Prior to and at the time the claims presented to the Commission arose, the Indians of California were comprised of a number of tribes, nations, bands and rancherias or villages, with each occupying a definite part of the area in California. The Commission held that this manner of tribal composition was not enough to make the Indians of California an "identifiable group of American Indians" within the intent and meaning of the Indian Claims Commission Act and that the claim should have been presented by a petition by or on behalf of each tribe or band.

On appeal to this court, we reversed the Commission and held the Indians of California to be an "identifiable group." In the case before us today, the Northern Paiute Nation, its constituents being separate land owning bands, is as much an "identifiable group" as was the Indians of California group. And, the Indians' claims herein were presented, in part, on behalf of each band. In the *Thompson* case we said (at p. 357):

> \* \* \* Congress clearly intended in circumstances such as we have here, to confer upon the Indian Claims Commission jurisdiction to hear and determine claims that might be presented to it by groups of Indians, \* \* even though the ancestors of such group existed as separate bands or villages at the time the claim arose. \* \* \*

■ For the Mono award to be made in this case, the Indians must have shown that there were either living mem-

bers or descendants of members of the "identifiable group" as a predicate for their claim. The Snoqualmie Tribe of Indians, supra, 372 F.2d at 957, 178 Ct.Cl. at 581, and cases cited. Also see Red Lake and Pembina Bands et al. v. Turtle Mountain Band of Chippewa Indians, and United States, 355 F.2d 936, 173 Ct.Cl. 928 (1965). The Commission, as stated previously, said that on the date the petition was filed there did exist Mono descendants. The descendants of the Mono group are clearly part of the Northern Paiute Nation, the "identifiable group," as it is constituted today, and on whose behalf, in part, this suit was brought. Though the Commission did not make its statement regarding the existence of descendants a formal finding of fact, there is unrebutted testimony that the tribal petitioners did have, among their members, descendants of the aboriginal inhabitants of the whole area claimed, including the Mono tract, and that among the individual petitioners, 15 of them being members of the tribal petitioners, there might be Mono ancestors. The findings of the Commission reflect that the original Monos were forcibly removed from their tract to the Tejon Reservation in California, but left it later and that most of them returned to their former country, continuing to live in their former manner.

■ We must stress that what we have just said relates solely to the question of jurisdiction. It may be that after an award is made and submitted to Congress, Congress may wish to legislate further concerning the payment and distribution of the award, "but this should have no bearing upon the question of jurisdiction to hear and determine the claims presented to the Commission." Thompson, supra, 122 Ct.Cl. at 359–360. Also see Snoqualmie Tribe of Indians, supra, 372 F.2d at 959, 178 Ct.Cl. at 585.

The next position of the Government is "that the Indians in territories previously under Spanish and Mexican sovereignty are not entitled to be compen-

sated for minerals which they were not themselves mining when they [the territories] came under the sovereignty of the United States." Its theory is that Indians in lands ceded by the 1848 Treaty of Guadalupe Hidalgo, 9 Stat. 922, which included the Northern Paiutes, were dispossessed of any subsurface rights they might have had by the Spanish monarchs, remained so dispossessed under Mexican rule, and therefore had no mineral interests in these lands when the United States assumed sovereignty in 1848. The Commission did not agree. If the Government is right, the valuation of the Paviotso tract would be but a minor fraction of the award the Commission has made for that tract.

In the recent case of Lipan Apache Tribe, etc. v. United States, 180 Ct.Cl. 487, at p. 493 (1967), we said:

* * * * * *

* * * the law of the prior sovereigns (Spain, Mexico, * * *) accepted aboriginal ownership * * *. "[T]he right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians living on the land." Sac and Fox Tribe v. United States, supra, [383 F.2d 991, 179 Ct.Cl. 8, cert. denied 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967)]. * * *

In *Lipan*, however, we did not deal with the question of whether the prior Spanish or Mexican sovereigns specifically intended to extinguish aboriginal Indian rights in subsurface minerals.

In Lipan, Id., at p. 492, we said the following of "extinguishment:"

* * * * * *

The correct inquiry is, not whether * * * [the prior sovereign] accorded or granted the Indians any rights, but whether that sovereign extinguished their pre-existing occupancy rights. Extinguishment can take several forms; it can be effected "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise

* * *." United States v. Santa Fe Pac. R. R., supra, 314 U.S. [339] at 347 [62 S.Ct. 248, 86 L.Ed. 260]. While the selection of a means is a governmental prerogative, the actual act (or acts) of extinguishment must be plain and unambiguous. In the absence of a "clear and plain indication" in the public record that the sovereign "intended to extinguish * * * the [claimant's] rights" in their property, Indian title continues. Id., at 353 [62 S.Ct. 248].

* * * * * *

The Government has failed to show in this case the required "clear and plain indication" that the prior sovereigns meant to extinguish the Indians' rights to the subsurface minerals in the lands occupied by them and ceded to the United States under the 1848 Treaty of Guadalupe Hidalgo. The evidence it has presented to us is, at best, favorable to both parties. That which we next refer to favors the Indians' position that their mineral rights were not "extinguished."

In the Government's brief is an excerpt from the Spanish mining law of January 10, 1959. It reads:

* * * We reclaim, resume and incorporate in ourself in our crown and patrimony, all the Mines of gold and silver and quicksilver of these our kingdoms, in whatsoever parts and places they may be, and are found * * * we will that the said Mines shall and may henceforth (without any other act of seizin (*apprehension*) and possession) belong to our said crown and patrimony * * *.

The Government said this showed the sovereign's intent to make royal ownership of all minerals, wherever situate, unquestioned. However, a reading of the entire law—some 9 pages—shows us the Government is clearly wrong.

In his introductory statement to the law, His Majesty Don Phillip II stated that the discovery, working and reduction of the Mines in the kingdom would benefit not only the Crown, but also its subjects and native citizens and the

public welfare of the kingdom as a whole. He then referred to a law of His Majesty Don Juan I, decreed in 1387, which stated, in part:

> * * * notwithstanding that by us and by the kings whom we succeed * * * there have been reserved for us Mines of gold and silver, and of other metals whatsoever, it is our gift that in future all said persons [ecclesiastical persons and the inhabitants and residents of the cities, villas and places of the kingdom] * * * shall be at liberty to search for and examine (*catar*,) and dig in *their* said *lands* and inheritances, the said Mines of gold and silver, and quicksilver and tin, and stones and other metals; and that they may also search and excavate in all other places whatsoever, not causing injury one to another in their searching and excavations, *and doing so with the permission of the owner;* and all that shall be found and taken out from the said Mines shall be divided as follows: First, that there shall be delivered and paid therefrom to the person who has taken out the mineral, all the expenses which may be incurred in excavating and extracting it; and of that which may remain after deducting said expenses, the third part shall belong to the person who has taken it out, and the other two-thirds to ourself. (Emphasis supplied, except for the word "catar").

Interpreting this to mean that "all persons are permitted to search for, and dig and work said Mines and metals" and that the apportionment as set forth therein was still to be made. Don Phillip stated that mining had languished for numerous reasons: first, many persons kept the information about Mines a secret so that the advantages from them would flow only to themselves; second, most of the Mines had been granted to noblemen and other persons, causing the whole Kingdom, as respected the Mines, to be divided up and distributed; third, many of the grants to individuals provided that a license from the grantee would have to be obtained before a mine could be discovered and worked, thus causing people to hold back from discovering and working the mines; fourth, many of the noblemen, "either in order to avoid the expense and labor, or because they do not give it their attention," had done very little to discover and work the Mines, and the benefit which would accrue to all by the working of the Mines had thereby been impeded; and fifth, because the law of Don Juan I was so ancient, many people were afraid it was no longer applicable. It was to overcome the above difficulties and to enable "the rewards and advantages" of working the Mines to be "effectually secured" that caused Don Phillip II to "reclaim, resume and incorporate" in the crown all the Mines. After "reclaiming" the Mines, Don Phillip II said:

> Art. 2. Inasmuch as the reclamation and incorporation of the said Mines in us, and in our royal patrimony, as aforesaid, are *not made with the object or purpose that we alone, or others in our name alone, shall search for, discover and work such Mines; but as, on the contrary, it is our intention and will that our subjects and citizens shall participate, and have a part in said Mines,* and engage in the discovery and working of them; therefore, by these presents, we give permission and authority to our said subjects, and native citizens, that they may freely, without our license, or the license of any one else, examine, search for, and dig the said Mines of gold and silver * * * and that no person, or persons, shall be at liberty to interpose any impediment or embarrassment, * * *. (Emphasis supplied).

This is not a clear indication that the sovereign dispossessed the Indians of subsurface mineral rights. In Article 5 Don Phillip II further said:

> * * * no other person can interfere to try, dig or work, and that within said space and limits the said discoverer alone shall have such right and power, without that he can be impeded

or prevented by us, or in our name, or by any other person, * * *

Article 4 was merely a variation of the apportionment scheme promulgated by Don Juan I, showing the law to be a revenue statute. This view finds further support in the law of August 22, 1584, which revoked, annulled and made void the law of January 10, 1559 to the extent it was in opposition to the new law. It was so in opposition mainly as to the Crown's share in mining profits.

The Government, relying on its reading of the 1559 law, told us it was codified as part of the law of New Spain and reasserted in the Mining Ordinances of 1783 as follows:

Art. 1. Mines are the property of my Royal Crown, as well by their nature and origin, as by their reunion declared in [the law of Don Phillip II in 1559].

Since our reading of the 1559 law is not the same as the Government's, the recodification of 1783 does not accomplish the same result either. The King additionally said:

Art. 2. Without separating them from my Royal Patrimony, I grant them to my subjects in property (*en propiedad*) and possession, in such manner that they may sell them, exchange them, rent them, donate them, pass them by will, either in the way of inheritance or legacy, or in any other manner alienate the right which in the Mines belongs to them on the same terms on which they themselves possess it, and to persons capable of acquiring it.

Art. 3. Let this grant be understood to be upon two conditions: first, that they shall contribute to my Royal Treasury the prescribed portion of metals; * * *.

Again we see the sovereign promulgating a revenue law. In addition, in a glossary to the Government's exhibit containing the quoted laws, "*en propiedad,*" as used in Article 2, is defined as follows:

*Propiedad.* Dominion, ownership, right of property. Also, landed estate.

*This term is used to express an exclusive right of property, in contradistinction to the right of use* or usufruct. (Emphasis supplied for the body of the definition).

Thus, the sovereign did not do what the Government would say he did: there was no "clear and plain" "extinguishment" of mineral rights of Indians.

Since the Indians' aboriginal title differed from the titles of the King's other subjects, which were of feudal origin or by Royal grant, and so more within Royal control, one would expect him to say so if he wanted to dispossess Indians. There were at least twelve separate edicts prohibiting various classes of individuals from working or discovering mines but not one of them referred to the Indians.

On December 19, 1526 and June 19, 1568, the sovereign seems to have formally recognized the Indians' existing right to subsurface minerals:

It is our grace and will, that all persons, of whatsoever state, condition, rank, or dignity, * * * shall be at liberty to take out (*sacar*) gold, silver, quicksilver, and other metals, either personally, or by their servants or slaves, from all Mines which they shall discover, or wherever they shall choose or think proper, and to hold them and work then freely, without any kind of impediment, * * * *provided that there result no injury to the Indians* * * *. (Emphasis supplied, except for the word "sacar").

* * * * * *

The Government argued that the following law, promulgated December 17, 1551, April 5, 1563, and March 6, 1575, emphasized that Indians and Spaniards were on a basis of equality with respect to mining and that the law would not have been necessary if the Indians had owned the subsurface rights:

We command that no restriction be placed upon the Indians in discovering, holding and occupying Mines of gold, or silver, or other metals, and in working them the same as the Spaniards may do * * *.

It is our view that the unquoted part of the law shows that Government's position to be wrong:

> * * * and that they may extract the metals for their own profit *and for the payment of their taxes;* and that no Spaniard or *Cacique* shall have part or management of any Mines which the Indians shall have discovered, held or worked. (Emphasis supplied, but not to the word "Cacique").

This again illustrates the function of the mining laws to be revenue raising statutes. In addition, in light of the laws of December 17, 1551, and May 5, 1575, the command that no restriction be placed on the Indians and that they should have sole part or management of their Mines seems to say that the Indians were not to be treated as second-class citizens because of their status as Indians and that their pre-existing subsurface rights were to be recognized.

█ If Indians discovered minerals on their territories they could mine them, according the monarch only his lawful share of the proceeds. While the Spanish law evidently gave the discoverer of minerals rights as against the surface owner, how that effected Indian title is not clearly spelled out. To treat the laws as taking everything from the Indians and giving nothing is to impute to the monarch an intent he never stated. While the Government has introduced other documents going to show the effect of Spanish law in the hope of supporting its position, they do not change the opinion we have just expressed. The Government has not "clearly and plainly" shown the Indians' subsurface mineral rights to have been "extinguished." Therefore, in 1848, when the United States assumed sovereignty of the lands in issue, the Indians held complete Indian title to them.

The next issue is whether, for compensation purposes, Indian title land includes the value of subsurface minerals.

█ In Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, at p. 942, 146 Ct.Cl. 421, at p. 449 (1959), we said:

> * * * whether the land to be valued is held by the Indian claimants under recognized title or merely under so-called Indian title, * * * the Supreme Court and this court have held that such land should be valued in the same way. * * *

What we seek is the fair market value of the lands claimed herein. Id., 175 F. Supp. at 943, 146 Ct.Cl. at 450. The fair market value of *recognized* title lands includes the enhancement in the value of the land caused by subsurface minerals. United States v. Shoshone Tribe, 304 U.S. 111, 118, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). Therefore, in determining the value of the *Indian* title lands in the instant case the Commission correctly included the value of subsurface minerals.

We consider next the errors assigned by both sides in the appraisement of the Paviotso tract, assuming that mineral enhancement is not to be excluded.

The Government assigned the Commission's failure, in determining the value of mineral lands, to allow for the improvements, such as shafts, tunnels, mine machinery and mills which were, the Government said, no part of the "Indian title," but for which portions they were awarded compensation. Contrary to the Government's contention, the Commission did not err by refusing to deduct from the valuation of mineral areas the improvements "made by others."

█ The record and the findings show that the Government does not now contest that the taking date of the Paviotso Tract was December 31, 1862.* It is equally uncontested that from the discovery of the Comstock Lode, in spring 1859 to that date, in Virginia City especially, and to some extent elsewhere in the area, the various mining companies incurred large expenditures in digging shafts and tunnels and in installing mine machinery and mills. This indeed brings

---

* See my separate observations, *infra,* where taking date is discussed.

to mind immediate questions whether the Indian claimants did have their awards enhanced by such improvements, and whether such enhancement was proper. However, it is incumbent on the Government to point out the nature of the error in this part of the determination below, and we hold it has failed to do so.

The Government referred to the miners as "others," disassociating them from the United States. However, the land involved was part of the public domain which they exploited, not only without interference by the National Government, but under its implied sanction; Del Monte Mining And Milling Co. v. Last Chance Mining And Milling Co., 171 U.S. 55, 18 S.Ct. 895, 43 L.Ed. 72 (1898); Sparrow v. Strong, 3 Wall. (70 U.S.) 97, 104, 18 L.Ed. 49 (1865); they were in no sense trespassers. Mining rights were not obtainable by patent until much later. The miners originated a "mining district" in 1859 according to their custom. In 1865 and 1866 the Congress retroactively validated the rules of such districts as evidence of title to mining claims vis-a-vis other miners, 13 Stat. 441, and vis-a-vis the United States, 14 Stat. 43. The territorial legislature had purported to do this earlier. See Sparrow v. Strong, supra, at p. 104. In 1860 United States troops defeated what was seen as an attempt by the Paiutes to drive the miners out of the Virginia City area. By allowing the prosecution of the claim before us, the United States adopts the miners' acts and assumes responsibility for them, however tortious they may have been in their origin. Shoshone Tribe of Indians, etc. v. United States, 299 U.S. 476, 495, 57 S.Ct. 244, 81 L.Ed. 360 (1937).

■ It would seem to follow that the United States stands in the shoes of the miners with respect to the improvements and is liable to the Indians to just the same extent as if its own engineers had constructed the improvements, but to no greater extent.

The Government cited our decision in Nez Perce Tribe of Indians v. United States, 176 Ct.Cl. 815 (1966) cert. denied 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1967), to the effect that the value of improvements is to be deducted from Indian awards. A glance at that case shows that it has no application here. The Commission therein appraised Indian lands involved in the litigation by reference to sales of similar lands, not so involved. However, the similar lands were to some extent improved and the lands to be appraised were not. Of necessity, the portion of the value of the similar lands attributable to improvements had to be excluded to make their sales in any way a measure of value. Here, the improvements were on the land taken, a totally different situation.

However, there is authority, not cited to us, which shows that the Government's contention does raise a serious question as to just compensation. In Consolidated Turnpike Co. v. Norfolk & Ocean View Ry. Co., 228 U.S. 596, 33 S.Ct. 605, 57 L. Ed. 982 (1913), the taker before the taking had purchased a right of way and built a railroad on it. Unfortunately, it had failed to settle with a mortgagee and instituted a condemnation proceeding to clear its title. In that proceeding, the mortgagee said: "pay me for the ties and rails of my fine new railroad." The State courts refused to award anything more than the value of the land unimproved. On writ of error, the mortgagee asked the United States Supreme Court to hold that the State deprived it of property contrary to the 14th Amendment. The Court said (at p. 602, 33 S.Ct. at p. 607):

\* \* \* \* \* \*

The rule of the common law, to which the plaintiffs in error refer, that fixtures annexed to realty become a part thereof and subject to existing liens thereon, is one subject to many exceptions. One of these is that applied by the Virginia court, namely, that when a corporation possessing the right of eminent domain enters upon lands necessary for its public purposes, under the deed of a mortgagor in possession, and places permanent improvements thereon in good faith, it may lat-

er condemn the interest and title of the mortgagee without being required to pay more than the value of the land without the improvements placed thereon with intent to acquire the entire title. * * *

* * * * * *

The highest secondary authorities have considered the case where the taker has made improvements in good faith prior to a taking and indicated that the opinion of the majority of courts is that the condemnee cannot receive the value of the taker's improvements. Orgel, Valuation Under Eminent Domain (1936) 310 and ff.; 5 Nichols, Eminent Domain (3d Ed.1952) 224 and ff.

In United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), the Supreme Court held that a condemnee could not recover any enhancement in the value of his land due to activity on the land by the taker before the taking date. In that case the activity consisted, not of improvements, but merely putting out stakes indicating the land would probably be taken.

▪ It is clear at any rate that valuation as of the taking date is not an invariable rule to be followed even if it produces a result that shocks the conscience of the court.

The most obvious way to resolve these difficulties would have been to find that the taking had occurred at some earlier date than December 31, 1862. The United States, which would appear to have suffered most by the date selected, has not preserved this issue for our review, in the opinion of a majority of the court. In the circumstances of this particular case the Government theory about improvements appears to be a belated attempt to reopen the date of taking issue. Our problem, however, is to determine if the Commission appraised the property correctly, assuming the taking date of the Paviotso Tract was December 31, 1862.

It must be noted that neither party attempted to show separately the value of unimproved land and improvements, offering a simple choice of striking or not striking a portion of value attributable to the improvements.

Experts on both sides constructed what they called a sales index of value for the Virginia City area, by far the most important part. These figures were close together and were given great weight by the Commission. They were weighted composites made up of sales prices for mining rights and transactions in the stock of mining companies at or about the taking date, related to footage on the lode. There were no transactions in fee simple titles because the Government had not parted with its underlying fee. The Government said below, as it said here, that the exclusion of improvements is to be accomplished by subtracting a figure of some $3½ million from the sales index of value.

The Commission dealt with this in their opinion. As we understand what they said, they thought that so large a deduction as $3½ million was not supported by the evidence, but in any event if the deduction was made, there would be offsetting adjustments that would cancel it out. This appears to be a reasonable interpretation of the facts.

The record shows that at Virginia City, between 1859 and December 31, 1862, there was a great waste of money and effort in digging shafts and tunnels and installing mine machinery and mills. Many of the items actually detracted from the value of the land because they were barren holes producing insufficient marketable ore, or none. Half of the mills installed were surplusage, as the other half could process all of the ore that the area ever produced. Some of the facilities were needlessly grandiose. These errors were due to ignorance about the geology of the Comstock Lode, oversanguine estimates of its future, inexperience, and the disorganized way in which development was conducted. Consequently, if one could have eliminated the improvements the reduction in value would have been a great deal less than the improvements cost. In the case of the mining company stocks, such an adjustment would have required a corre-

sponding elimination of debt incurred by these companies in constructing the improvements. In such cases the stock might have been worth more if the improvements had never been undertaken. The most remarkable thing about the Government's contention is that it is willing to allow the hypothetical purchaser of Virginia City, unimproved, the benefit of all the geological knowledge that was attained in the course of making the improvements.

It is agreed by everyone who has studied the history of the Comstock Lode that exploitation would have been far more successful, and many financial disasters avoided, if mining had been conducted on a well managed basis with good geologic advice, and with wasteful duplication of facilities eliminated. The Government's hypothetical purchaser would appear, therefore, to be one with all the options restored to him, the wrong exercise of which led so many actual developers to insolvency, but simultaneously he has presented to him gratis the geologic knowledge of the strata that was actually obtained at such a heavy cost.

 The Commission concluded that the making of speculative deductions for improvements would have been no help to the Government when the necessary countervailing adjustments were also considered. We think this evaluation is supported by substantial evidence and cannot now be disturbed.

In light of the role of the Government in inducing the Commission to adopt the sales index of value method and the lack of any assignment of error by its side related to this, it is unnecessary to consider now whether this was the soundest method of determining the value of the Virginia City mineral area as of December 31, 1862. It does seem apparent that establishing a taking date for Virginia City and the Comstock Lode, three and one-half years after exploitation on a large scale commenced, really let the genie out of the bottle, and for the Commission to have corked it up again in an intellectually satisfactory manner is be-

yond reasonable expectation. The conceptual difficulties involved when the taker improves the property before the taking date are brilliantly discussed by Orgel, op. cit. supra, and exposition of them by us would be useless. We do not think the Commission was required as a matter of law to deduct $3½ million, or any other figure, as the supposed value of improvements, from the value estimated by the sales index method.

It will be noted that the Commission did not formally find the values of mineral areas separately. It fixed a single figure for the entire Paviotso Tract, Nevada portion, including timber, grazing and agricultural areas, and desert. The Government's argument requires us to consider as a finding the statement in the opinion, not the findings, that a fair value for the Virginia City District, if considered separately, would have been $8.7 to 9.7 million and the subsidiary statements in support of that view. We have, *arguendo*, so considered these statements.

 On behalf of the Indians we confront at the outset strenuously urged and elaborately documented contentions that the findings of the Commission are insufficient. One difficulty, however, is that the Indians say nothing to show they face up to the situation that we, if dissatisfied with the scope of the findings, cannot make new ones of our own but must remand the case to the Commission. Snake or Paiute Indians, etc. v. United States, 112 F.Supp. 543, 125 Ct.Cl. 241 (1953). Do they really want a remand even if we are prepared to affirm a substantial award in their favor, of $15,790,-000 after offsets for two tracts in Nevada? We think a party making the kind of objection the Indians do should make its position clear.

 Plaintiffs said the Commission should have valued separately the various mineral areas, as their expert witnesses did. In fact the Commission did this only for the Virginia City-Comstock Lode district, and that only in its opinion, not its findings. It would not

have committed reversible error had it accommodated plaintiffs in this regard. We did the job that way in The Tlingit And Haida Indians of Alaska et al. v. United States, 389 F.2d 778, 182 Ct.Cl. (1968), a case we had under original jurisdiction, not an appeal case. On the other hand, the Commission's method in The Winnebago Tribe And Nation of Indians v. United States, 16 Ind.Cl.Comm. 81 (1965), aff'd. without opinion 181 Ct. Cl. (1967), agrees with the one used here. Apparently the trier of fact has an election in the appraisement of large, contiguous areas taken at the same time from the same group or tribe. Obviously there are objections both ways. The value of the sum of the parts may exceed the whole, because, e. g., population, food or transportation problems may be seen as a curb on future development only when the area is viewed as an entirety. On the other hand, the "willing buyer", a figment at best like the ordinary prudent man, becomes completely unimaginable if he is conceived as buying 10 million acres in order to get a few thousand of mineral lands. When a tract has portions having highest and best uses for mining, grazing, farming, and mere cactus desert, but is valued as a single unit, it has the look of the traditional horse and rabbit stew. Our views stated in Citizen Band of Potawatomi Indians of Oklahoma, et al. v. United States, 179 Ct.Cl. 473 (1967), cert. denied 389 U.S. 1046, 88 S. Ct. 771, 19 L.Ed.2d 839 (1968), were not intended to bar separate evaluation of mineral areas, preliminary to an overall determination, but only a separate award for minerals in the ground. We think a trier of fact who elects either procedure should explain why, as we did in Nez Perce Tribe of Indians v. United States, supra. We do not think the omission to do so here is a defect that necessitates a remand.

The Indians' other complaint about the findings is that the Commission rejected its expert appraisers' views, and did not spell out why in detailed findings. In legal appraisement, however, widely divergent opinion testimony is the rule rather than the exception. The trier of fact must decide first, of course, if such testimony is competent and admissible. Before us, no party claims that this case was decided with respect to any issue on inadmissible testimony. The Indians wanted the Commission to take up the reasoning of its appraisers step by step, and either accept each step or show reasons for rejecting it. Having competent testimony before it, the Commission was not restricted to swallowing it whole or rejecting it utterly. It did not have to refute what it did not accept as controlling. It could, and apparently did, synthesize in its mind the immense record before it, determine to what extent opinion evidence rested on facts, consider and weigh it all, and come up with figures supported by all the evidence, perhaps, though not identified with any of it. The Commission did, however, give us a good deal of enlightening discussion of the value issues, and one cannot read it as a whole without getting ·a pretty clear idea of how they approached their task. Nor does the Indians' brief on the remaining issues seem hampered by uncertainty as to what the Commission held.

We now turn to the Indians' substantive complaints about the evaluations the Commission made. Besides part of Virginia City and the Comstock Lode, the Paviotso Tract also included lesser mineral areas. The Indians constructed sales indexes of value for them also. The two most important, the Esmeralda and Humboldt districts, the Indians showed by that method to be worth $4,689,318 and $7,962,331, respectively. The Commission never found a separate value for these portions but if, as stated in the opinion, $8.7 to $9.7 million is assignable to Virginia City, out of $15,750,000 for the whole Paviotso Tract in Nevada, it is clear, as it said, that it considered the sales index to show a grossly inflated value for the other areas. The Indians said, if the sales index is so infallible for Virginia City, the Commission should have applied it in an "evenhanded manner" across the board.

As to the Humboldt, the argument answers itself. The Indians' own mineral experts said that miners and prospectors in the area were misled by surface indications which would not have deceived a competent geologist. They assigned a value on the taking date of but $3,000,000. The Humboldt never amounted, then or later, to anything comparable to the Comstock Lode. A sales index of value for Humboldt of $7,962,311 compared to $9,779,239 for Virginia City is preposterous on its face, even considering that part of the Comstock Lode was outside the Paviotso Tract.

The case of Esmeralda differs only in that the Indians' sales index there produced a figure approximately agreeing with their value estimate. The Government's expert witnesses made indexes based on stock sales that were markedly lower. However, the Commission noted that here, too, prices were extravagant in relation to the real values. Here the Indians' index was arrived at by extrapolating from the transactions of a few companies in a manner that is difficult to follow and the Commission considered to be dubious. It would seem that the record, including that submitted by the Government, would furnish the support of "substantial evidence" for a wide range of values. The Indians said that stock prices and values suffered from litigation, inefficiency, mismanagement, and poor mining and milling practices. This may have been so, but it was for the Commission to evaluate the impact these conditions might have had. It is significant that the Indians' same experts who appraised the Virginia City district at over twice the sales index figure appraised Esmeralda approximately at the sales index! They must, therefore, have perceived a difference in the two districts justifying an "evenhanded" appraiser in treating them as different, as the Commission did.

The Commission's use of the sales index in evaluating the Virginia City district did not establish a rule of law that they had to use the index in the same fashion everywhere. They had before them opinion evidence on other factual bases. Each district was a separate problem requiring a separate solution.

The Commission, as we have several times stated, would have valued the portion of the Comstock Lode—Virginia City district that was within the tract, at $8.7 to 9.7 million, if it were to be valued separately. The Indians assigned it $23 million, and it is interesting to see how, as it was more than twice their own computed "sales index."

The two mineral experts for the Indians estimated 3,859,000 tons of ore at reachable levels in the Comstock Lode and within the tract, on the basis of what was known in 1862. This contrasts with 2,893,762 tons actually produced there up to 1882, when the lode was about exhausted. The difference they credited largely to "mail losses" avoidable by efficient operation. They valued the ore at $75 per ton, with a gross value of $289,440,000, and a "gross recoverable value" of $212,256,000. The cost of production at an estimated $25 per ton was $96,480,000, and the total operating profit would have been $115,776,000. This was all on the basis of a postulated unified operation, obtaining greater production at far lower cost than the actual inefficient small separate operations could possibly have done. The figure of $23,000,000, represents a payment of twenty percent of the anticipated profit to the proprietor of the soil, the other eighty percent of course representing the share belonging to the party furnishing capital, know how, and access to markets.

The failure of the "sales index of value" to support the $23,000,000 figure was attributed to the fact that the actual sales were depressed by the poor profit expectations due to high production cost and a low recovery ratio, both reflecting the inefficient division of ownership and exploitation of the lode among so many hands. It is clear, therefore, that the assumption of a single "willing buyer" purchasing the entire Comstock Lode, or at least all of it in the Paviotso Tract, was basic to the $23,000,000 appraisement, the keystone of the arch.

The rules of the mining district, as we have seen later validated by the Congress and made the basis of title to mining claims, provided that no claim should exceed 200 feet square. The prospectors were as truly rugged individualists as we have ever had in this country. It was clearly their intent to discourage monopoly although, of course, the claims of several prospectors could be combined by purchase to make possible a viable mine. That there was no actual monopoly in exploiting the Comstock Lode was no accident but flowed directly from their laws. The assumption by the Indians herein of a monopolistic development, is something like an appraisal of a vacant city lot, which seeks to substantiate a high value on the basis of an imposing hypothetical building in violation of the applicable zoning law. Orgel, op. cit., supra, at pp. 105–110.

There is nothing in the Indians' appraisal report to show any effort to discover whether in 1862 any person (or corporation) existed in the United States who could write a check for $23,000,000 just for the mining rights, without starting on the other capital investments requisite to development. If there is a tendency in such cases as this to ignore a lack of persuasive verisimilitude in the portrait of the supposititious "willing buyer", still there is precedent for supposing that if he buys a vast tract, at least he will expect some discount, on a per unit basis, because of the magnitude of his purchase. Nez Perce Tribe of Indians v. United States, supra. The Indians' figures made no allowance for this. Their "willing buyer" grandly ignores the probable lack of other buyers, such as normally by their competition drive up the price of real estate, and in his generosity disregards the fact that the Indians, if they do not sell to him, will have the tract on their hands for a century, in all likelihood, or else will have to sell to the inefficient small developers. His calculation of what he will pay is based entirely on what he considers a reasonable cut from his anticipated profit, and

he takes no notice of the going prices for claims such as he is to buy. It is regrettable that such eleemosynary characters were not common in the West as it actually was.

The "willing buyer" can see that the inefficiency of the existing operation, its high costs and low rate of recovery, are due to causes his intended monopoly will eliminate. As the latter is entirely a paper project, the offsetting "bugs" a less sanguine investor might expect in it have no chance to disclose themselves. We all know, of course, that monopoly and bureaucracy are not always more efficient than individualism and free enterprise.

■■■ We agree with, and need not repeat, the reasons the Commission put forward for not appraising by this method. The Commission admitted this scheme in evidence nevertheless and considered it. It derived enlightenment from it, no doubt as it said. The Indians would have us hold that the Commission was compelled as a matter of law to swallow it whole, or that its contrary findings are not supported by substantial evidence. In other words, that the Indians' own "sales index of value" is not substantial evidence. Such contentions, stated in those terms, as we would have to do, afford their own answers and no others are necessary. The Government cited authority that schemes of this kind are not even admissible in evidence. In view of our decision in *Tlingit And Haida*, supra, that view would seem no longer tenable in this court. It remains true, however, that an evaluating body which has admitted opinion evidence of value of various sorts, based on different facts and arriving at conclusions by different routes, is not bound by it just because it has been admitted. The tribunal must give weight to the evidence in inverse ratio to the amount of speculation and unfounded assumption it perceives to form a part of it. Though the "sales index of value" may have been depressed by the inefficiency of the miners which a single operation could eliminate, on the other hand it was inflated by the unfounded optimism

which, as the Commission found, was rampant at Virginia City too, at or about the taking date. It was not likely that a hypothetical single operator with $23,000,000 to spend would be more reckless than the actual speculators whose deals in composite made up the "sales index of value." The Commission gave us a fine quote as to this, [16 Ind.Cl.Comm. 215, 331, 332] taken from Eliot Lord's superb Comstock Mining And Miners, which was originally published in 1883, and based on interviews with many participants in Comstock operations, who were then still living, as well as extensive search of records. A 1959 edition was admitted in evidence as Defendant's Exhibit G-27, and Petitioner's Exhibit G-22. That is, both sides offered it. The quote begins at p. 125 and with supporting footnote reads:

\* \* \* \* \* \*

\* \* \*. Men walked the streets of Virginia City as if pacing the roof of a fathomless treasure house, and their heads were constantly in the clouds. They saw a network of silver beneath their feet and the fine strands widening into solid wedges of ore. The eyes of the soberest minded even were dazzled by the vision, and the fancy of the imaginative ran wild. No metaphor can exaggerate the prevailing delirium. It would appear that a silver mist enveloped the slopes of the Sun Peak and men moved and breathed in its unnatural atmosphere. Drunk with the vapor, all prudent considerations were laughed to scorn. Timid suggestions of the utility of thrift and the possibility of an approaching exhaustion of the ore deposits were unheeded or unheard. Every large stockholder in a productive mine counted himself a nabob and scattered his money broadcast like a prince bestowing largesses. The conception of the Brazilian spendthrift in Der Seekadet is scarcely a burlesque of the Washoe production. One fits his doors with handles of solid silver and buys a library like a ledge, by the foot; another fills his water-tank with champagne to enliven the guests at a wedding.[1] \* \* \*

1. W. N. C. Maxwell, Superintendent New Idria Mine, California, formerly Superintendent Overman Mine, Gold Hill, Nevada; Jerome B. Stillson, Correspondent New York World, Letter dated July 3, 1865.
 \* \* \* \* \*

These are the people whose purchases and sales of mining rights and stock in mining companies made a composite value less than half the figure the Indians claim. The Commission need have said no more, and was not required to go through the assumptions and predicates of the Indians' $23,000,000 figure, step by step, acquiescing in or refuting each one. Clearly its rejection was based on substantial evidence.

Accordingly the decisions of the Indian Claims Commission under review are affirmed and the appeals taken by both sides are dismissed.

Affirmed.

NICHOLS, Judge.

Having stated the unanimous views of the court respecting the issues the parties have argued before us, I deem it appropriate to add certain comments on my account only. They are not in conflict with the opinion prepared for the court, and in a way tend to reinforce the result it reaches. They relate entirely to the date of taking of the Nevada portion of the Paviotso Tract, and everything stated is to be deemed applicable only to that.

The Commission found that the above tract was taken on December 31, 1862 (Finding 30, 7 Ind.Cl.Comm. 616, 617). The key importance of the date chosen will be apparent from consideration of the technique of appraisal the Commission used and its application to the facts. It valued in its findings the tract as a whole at $15,750,000 but made it clear in its opinion that $8.7 to $9.7 millions represented the mineralized are of the Virginia City district only. As to that, the method of appraisement is highly contemporary to the taking date, being based

as a starting point on sales of mining rights and stock in mining companies in the district at or about the valuation date, with possible upward and downward adjustments mostly rejected. If the Commission had selected the date of original discovery of the Comstock Lode, 1859, it would have had to consider sales of their rights by the original discoverers at relatively trifling figures. On the other hand, 1865 was for the Comstock a period of forced liquidations, with many investors wiped out. It is clear, therefore, that December 31, 1862 is a more fortunate selection from the point of view of the Indians than many other dates would have been. I do not conceive that the limits of our appellate function, in light of the valuation issues tendered by appellee, bar us from considering the finding which, by the Commission's valuation technique, more than any other controls the amount of the award. How did they pick that date?

There was no trial on the issue. The parties jointly suggested the year 1862, and submitted in support thereof a historical recital which the Commission picked up and used verbatim as its Finding 30.

Finding 30 recites that in 1859 the Indian Agent and the Superintendent for Indian Affairs for the territory commenced to plan the removal of Indians to two named tracts they had selected and recommended to the Secretary of the Interior; that hostilities with the Indians broke out but ended in a truce in August, 1860, at which time a public notice was posted forbidding trespass on the selected tracts; that councils were held in 1861 and 1862 to induce the Indians to settle on the reservations. *"By the end of 1862, many of the Indians had expressed a desire to remain at peace, provided a reservation be set apart for their permanent home. On December 31, 1862, the Pyramid Lake and Walker River reservations had come into operation and had been accepted by a substantial number of Indians."* (Emphasis supplied). In 1864 and 1865 these reservations were surveyed and in 1874 were established by Executive Orders as reservations for our Indians.

Nothing is said about any force being used on the Indians to compel them to move to the reservations, nor did they relinquish by contract or treaty, formally or informally, whatever ownership they had in lands outside the reservations. No formal act of extinguishment of title is recited, from that day to this.

The Commission may have had in mind that the tract was not taken all at once, and have viewed the chosen date as an average. Creek Nation v. United States, 302 U.S. 620, 58 S.Ct. 384, 82 L.Ed. 482 (1938). However, in that case the selection of the different dates to merge into the average rests on the premise that takings according to established legal principles did occur on the dates averaged.

These findings fail to show that a taking occurred on December 31, 1862, or for that matter, on any other date. The record shows that takings did occur, but at different times and by force of different circumstances.

The record before the Commission and its findings reflect that there was sporadic extraction of gold from 1850, in the Paviotso Tract, Nevada portion. However, it was a hard living at best, and less successful as time went on, so that the gold seekers (one cannot call them miners), who had dropped out from among the westward migrants to California, mostly drifted along. In the spring of 1859 came the dramatic discovery of the Comstock Lode with its wealth of gold and silver ore. The remaining whites located claims all over the hills. They organized a "mining district" according to California precedents, with rules for the staking and recording of claims, and how much actual working was requried to keep the discoverer's rights alive. When word reached Sacramento and San Francisco, the tide of population reversed its flow; the prostitutes, the faro dealers, the bad men, and the honest prospectors all flowed back East through the passes of the Sierras.

As early as 1858 the Indians had been reported to be in a suffering and destitute condition. This was attributed to the invasion of the Indians' hunting grounds by pioneers who had "reduce[d] nature's wilds to the dominion of the white man." No doubt the added white population made this bad situation worse.

What was the United States Government doing? Nothing. These lands were supposed to be public domain, acquired by the treaty of Guadalupe Hidalgo in 1848. In 1860 the Congress debated measures to require licensing of mining and royalty payments, but nothing was enacted. There were never any patents or deeds to the Comstock Lode.

In 1861, at the miners' behest, the Congress split the territory of Utah, as it then was, into two, the western portion becoming Nevada. This was mainly to establish law and order in the mining camp of Virginia City, and to provide a territorial judiciary which would adjudicate the innumerable lawsuits between the mining companies. The titles of these mining companies derived from, and only from, the stakes put out by half-legendary prospectors, and recordings, mostly doctored, kept for the miners by a local blacksmith. In 1865 the Congress enacted that the rules of the mining district should be evidence of title in disputes of the miners vis-a-vis one another, 13 Stat. 441, and in 1866 it made their claims valid as against the United States, 14 Stat. 43.

In 1865, in Sparrow v. Strong, supra, an ejectment action between two mining companies, reached the United States Supreme Court on writ of error to the Territorial Court. It had been brought before the above enactments, and they were not considered as applicable. Defendant urged that the minimum jurisdictional amount of $2,000 was not at issue because the dispute was between two groups of trespassers on the public domain, neither of which could possibly have any property right in the land. The Court answered (3 Wall. (70 U.S.) at p. 104, 18 L.Ed. 49):

\* \* \* \* \* \*

\* \* \*. The Territory, of which Nevada is part, was acquired by treaty. Rights and titles, acquired under ceding governments, remain unimpaired under our government. We cannot know judicially, therefore, that the right and title in controversy was not so acquired. If it was, it certainly may be capable of being valued in money.

But if this were otherwise, we do know that in the act organizing the Territory of Nevada there is no clause annulling grants or claims to land, while large legislative powers are conferred by the Territorial legislature, limited only, as to lands, by the prohibition of interference with the primary disposal of the soil by the United States, and of unequal taxation in certain cases. We know, also, that the Territorial legislature has recognized by statute the validity and binding force of the rules, regulations, and customs of the mining districts.\* And we

\* Laws of Nevada Territory, p. 16, § 40, and p. 21, §§ 74, 77.

\* \* \* \* \* \*

cannot shut our eyes to the public history, which informs us that under this legislation, and not only without interference by the national government, but under its implied sanction, vast mining interests have grown up, employing many millions of capital, and contributing largely to the prosperity and improvement of the whole country.

We cannot dismiss this writ of error, therefore, on the ground that a controversy concerning the possessory right to a mining claim, existing under the express sanction of the Territorial legislature and the implied sanction of the national government, does not relate to a subject-matter capable of being valued in money.

\* \* \* \* \* \*

In Del Monte Mining And Milling Co. v. Last Chance Mining And Milling Co.,

supra, the Court reviewed the history of mining claims in the public domain. At p. 62 of 171 U.S., 18 S.Ct. 895, 43 L.Ed. 72 it cited and quoted from Sparrow v. Strong, so that case settled the nature of such claims prior to 1866. See also cases cited therein.

It is, therefore, clear that from 1859 on, the exploitation of the Comstock Lode and elsewhere on the public domain by the miners was not tortious and they were not squatters or trespassers, as the court assumed the miners were in Tlingit And Haida Indians of Alaska et al. v. United States, supra.

What of our Indians? We have already mentioned the invasion of their hunting grounds. In the spring of 1860 the local Paiutes, previously peaceful, took umbrage because two of their women had been kidnapped by white traders. They killed the offending traders and burned their trading post. Later history viewed this act as a legitimate reprisal by frontier standards, but Virginia City saw it as an Indian atrocity. Miners organized themselves as a posse to the number of 100 or more and set forth on a punitive expedition. This was soon proved to be rash indeed. A force of several hundred Paiute braves intercepted them, and after a flag of truce was fired upon, cut off the posse and utterly destroyed it. Half its number lost their lives. Virginia City then frantically sought to fortify itself, and telegraphed for help to California. A force came over the Sierras to the rescue, part Army regulars, part militia, and part volunteers for the fight. They offered battle to the Paiutes, and inflicted a sharp defeat upon them. The Paiute survivors saved their lives by fleeing to inaccessible places, and these Paiutes never made trouble again, ultimately withdrawing into the reservations as the Commission has found.

It is not clear whether the Paiutes intended to terminate mining operations at Virginia City and reassert their dominion over that portion of their heritage. It is, however, evident that Virginia City thought that was their intention, and the intervention of United States troops, including regulars, was to prevent it from being carried out. It is likewise clear, under the uncontested findings in this case, that the Paiutes were at that time the true holders of aboriginal title to the Comstock Lode and the whole Virginia City mining area, so far as they were in the Paviotso Tract, and if they had driven the miners out, they would only have been repossessing their own.

In Lipan Apache Tribe, etc. v. United States, supra, we held that it would constitute a taking if United States troops drove an Indian tribe off their property at the behest of third parties and for their benefit. I do not see any significant difference if, as here, the third parties have seized the property by themselves and the intervention of the United States forces was only afterwards to maintain a possession that, but for them, would have been rightfully terminated. Here, however, this brief military campaign is but one of the circumstances that show the Government as having adopted and ratified the seizure by the miners of the Virginia City and Comstock Lode areas. The others are: the considered and informed refusal of the Congress to intervene; the establishment of a separate territorial government for Nevada, at the miners' behest; the establishment of a judiciary to adjudicate disputes between miners, as to their ownership of the lode; and the determination of the Supreme Court that the miners were not mere trespassers on the public domain. Apart from the litigation between miners, with which the Indians were not concerned, the practical effects were the same as if the Government had issued patents to the miners in 1859, and I would hold the legal effects were the same also. The United States effectively protected the miners against interference from any source, except their own number, until the Comstock Lode was depleted by them, and the issues had become for them academic.

It is irrelevant to consider exactly when the trespass by the miners became, by adoption and ratification, a taking by the United States, because once that step

was taken, it related back to the first move, even one originally tortious. Shoshone Tribe of Indians, etc. v. United States, supra. The first discovery of the lode in 1859 was the immediate cause of a rush of white population into Paiute territory. The aviation easement cases afford a parallel: we have repeatedly held that the first material and sustained invasion of the plaintiff's property starts our six-year statute of limitation running. The latest case is Town and Country Motor Hotel, Inc. v. United States, 180 Ct.Cl. 563 (1967); see other cases cited therein. In light of undisputed facts it is an error of law to fix the date of the taking of the Virginia City district at any date after 1859, an error not correctable by any stipulation or concession of the parties. See my dissent in Tlingit And Haida Indians of Alaska et al. v. United States, supra.

The same principle would fix the taking dates of any other mining areas in the Paviotso Tract. As to land adapted for agricultural or homestead purposes, the patent dates would control. As to land still in the public domain, still vacant, I do not think it has been taken yet.